In re H. KING & ASSOCIATES,
Debtor.

Gina B. Krol, Trustee, Plaintiff,

v.

Joseph Wilcek, Earl Wilcek and HKA
Display, Inc., Defendants.

Bankruptcy No. 99 B 17717.
Adversary No. 01 A 00521.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

June 23, 2003.

Barry Chatz, Esq., Richard K. Hellerman, Esq., Dawn C. Wrona Eby, Esq., Arnstein & Lehr, Chicago, IL, for Plaintiff/Trustee.

James M. DeZelar, Esq., Robbins, Salomon & Patt, Ltd., Chicago, IL, for Defendants.

Gina B. Krol, Esq., Cohen & Krol, Chicago, IL, trustee.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON COUNTS I, II AND III AND MEMORANDUM OPINION ON COUNTS IV, V, XV AND XVI

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the complaint filed by Gina B. Krol, the Chapter 7 case trustee (the "Trustee") for the Debtor, H. King & Associates (the "Debtor") against Joseph Wilcek ("Joe"), Earl Wilcek ("Earl") and HKA Display, Inc. ("HKA"). For the reasons set forth herein, the Court enters its proposed findings of fact and conclusions of law and recommends that the District Court grant judgment against Joe and Earl jointly and severally and in favor of the Trustee under

Count I of the complaint. The Court recommends that the District Court order an accounting from Joe and Earl to specifically identify all revenue realized by them, either directly or through HKA, from, in connection with, or as a result of the relationship with R.J. Reynolds Co. that was diverted from the Debtor and utilized by Earl and Joe through HKA. Moreover, the Court recommends that the District Court impose a constructive trust on all assets presently being held by Earl and Joe, either directly or through HKA, so that it may be determined whether assets of the Debtor are being held in furtherance of, or as a consequence of, the usurpation of the R.J. Reynolds Co. corporate opportunity. Further, the Court recommends that the District Court deny the Trustee's request for her attorneys' fees under 805 ILCS 5/12.60(j).

In addition, the Court recommends that the District Court grant judgment against Joe and Earl jointly and severally and in favor of the Trustee in the amount of $500,000.00 for actual damages under Count II of the complaint. The Court recommends that the District Court award the Trustee punitive damages in the sum of $500,000.00, which shall be assessed against Joe and Earl jointly and severally. The Court further recommends that the District Court assess the Trustee's taxable costs against Joe and Earl jointly and severally pursuant to 28 U.S.C. § 1920. The Trustee shall submit a bill therefor pursuant to Local Bankruptcy Rule 7054–1 within thirty days hereof.

Finally, the Court recommends that the District Court grant judgment in favor of HKA pursuant to Count III of the complaint.

Pursuant to Count IV of the complaint, the Court finds that the Trustee has demonstrated that the transfers to Joe in the aggregate amount of $33,244.81 constitute fraudulent conveyances under to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B). The Court enters partial judgment in favor of the Trustee and against Joe in the sum of $33,244.81 under Count IV of the complaint. Under 11 U.S.C. § 550(a)(1), the Trustee may recover those transfers from Joe for the benefit of the Debtor's estate, plus prejudgment interest from the date of the filing of the adversary proceeding, June 1, 2001, pursuant to 28 U.S.C. § 1961. In addition, the Court finds that the transfers from the Debtor to Joe were fraudulent under 740 ILCS § 160/5(a)(1) and 740 ILCS § 160/5(a)(2). Pursuant to 11 U.S.C. § 544(b)(1), the Trustee may recover those transfers in the sum of $33,244.81 from Joe for the benefit of the Debtor's estate, plus prejudgment interest from the date of the filing of the adversary proceeding, June 1, 2001, pursuant to 28 U.S.C. § 1961.

Moreover, the Court grants judgment in favor of the Trustee and against Joe under Count V of the complaint. Pursuant to Count V, the Court finds that the post-petition transfers by the Debtor to Joe in the sum of $1,788.44 violated 11 U.S.C. § 549(a). Pursuant to 11 U.S.C. § 550(a), the Trustee may recover those transfers from Joe for the benefit of the Debtor's estate, plus pre-judgment interest from the date of the transfers pursuant to 28 U.S.C. § 1961.

The Court assesses the Trustee's taxable costs incurred under Counts IV and V of the complaint and allowable under 28 U.S.C. § 1920 against Joe. The Trustee shall submit a bill therefor within thirty days hereof pursuant to Local Bankruptcy Rule 7054–1.

The Court enters judgment against the Trustee and in favor of Joe under Counts XV and XVI of the complaint.

On July 15, 2002, in her exhibit list filed with the Court, the Trustee indicated that she would not be pursuing Counts VI, VII, VIII, IX, X, XI, XII, and XIII of the complaint. Moreover, on November 4, 2002, the Trustee voluntarily dismissed Count XIV of the complaint. Accordingly, the Court will not further address these counts.

## I. *JURISDICTION AND PROCEDURE*

Bankruptcy jurisdiction is determined under 28 U.S.C. § 1334(b), which provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). While § 1334 sets forth jurisdiction of the district courts, 28 U.S.C. § 157(a) enables district courts to refer all such cases and proceedings to the bankruptcy judges for the district. *See* 28 U.S.C. § 157(a). The District Court for the Northern District of Illinois has referred all bankruptcy cases under its jurisdiction to the bankruptcy judges pursuant to Internal Operating Procedure 15(a). Through that reference from the District Court, jurisdiction lies here over matters arising under, arising in, or related to bankruptcy cases under 28 U.S.C. § 1334.

Section 157 divides bankruptcy jurisdiction into two categories: core and noncore. Under 28 U.S.C. § 157(b)(1), "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1). Core matters are those "arising under" title 11 or "arising in" a case under title 11.

Jurisdiction over matters "arising under" the Bankruptcy Code or "arising in" bankruptcy proceedings "is limited to questions that arise during the bankruptcy proceeding and concern the administration of the bankruptcy estate, such as whether to discharge a debtor." *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 162 (7th Cir.1994) (citations omitted). These matters are termed "core proceedings" and, for the most part, are enumerated by statute in 28 U.S.C. § 157(b)(2). *Barnett v. Stern*, 909 F.2d 973, 979 (7th Cir.1990). "Arising under" jurisdiction involves causes of action created or determined by a statutory provision of title 11. *Id.* at 981. "Arising in" jurisdiction encompasses administrative matters that arise only in bankruptcy cases—matters not based on any right expressly created by title 11, but without existence outside of bankruptcy. *Diamond Mtg. Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1239 (7th Cir.1990).

The question whether a matter falls within the bankruptcy court's core or non-core "related to" jurisdiction relates to how jurisdiction is exercised-whether the bankruptcy court is limited to making findings and conclusions for the district court, or whether it may issue a ruling outright. *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1303 n. 9 (11th Cir.2001).

Under 28 U.S.C. § 157(c)(1), a bankruptcy judge "may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." However, in such non-core proceedings, proposed findings of fact and conclusions of law must be submitted to the District Court, which has authority to enter the final order or judgment. 28 U.S.C. § 157(c). Non-core matters over which bankruptcy courts have limited jurisdiction are those "related to" a bankruptcy case. The Seventh Circuit has articulated a somewhat limited definition of "related to"

jurisdiction, holding that " '[a] case is "related to" a bankruptcy when the dispute affects the amount of property for distribution [i.e., the debtor's estate] or the allocation of property among creditors.' " *In re FedPak Sys., Inc.,* 80 F.3d 207, 213–14 (7th Cir.1996) (*quoting In re Memorial Estates, Inc.,* 950 F.2d 1364, 1368 (7th Cir.1991), *cert. denied,* 504 U.S. 986, 112 S.Ct. 2969, 119 L.Ed.2d 589 (1992)); *see also In re Xonics, Inc.,* 813 F.2d 127, 131 (7th Cir.1987). The Seventh Circuit has explained that it reads § 157(c) narrowly "not only out of respect for Article III but also to preserve the jurisdiction of state courts over questions of state law involving persons not party to the bankruptcy." *Home Ins. Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746, 749 (7th Cir.1989). Overlap between the debtor's affairs and another dispute is insufficient unless its resolution also affects the debtor's estate or the allocation of its assets among creditors. *Id.*

■ Having reviewed the Trustee's first three causes of action: (1) Count I—deprivation of corporate opportunity against Earl and Joe; (2) Count II—breach of fiduciary duty against Earl and Joe; and (3) Count III—corporate successor liability against HKA, the Court concludes that none of these causes of action "arise under the Bankruptcy Code in the strong sense that the Code itself is the source of the claimant's right or remedy, rather than just the procedural vehicle for the assertion of a right conferred by . . . state law." *In re United States Brass Corp.,* 110 F.3d 1261, 1268 (7th Cir.1997) (citations omitted). Moreover, these causes of action do not uniquely occur in connection with this bankruptcy case so as to "arise in" this case. Rather, they are state and common law causes of action not unique to bankruptcy proceedings in general or this case in particular.

■ The Court finds that Counts I, II and III of this adversary proceeding fall within the bankruptcy court's non-core "related to" jurisdiction because a judgment in favor of the Trustee, if recovered, would bring assets into the estate, thereby increasing the pool available for distribution to creditors. *See Diamond Mtg.,* 913 F.2d at 1239. Accordingly, the Court is required, pursuant to 28 U.S.C. § 157(c)(1), to submit proposed findings of fact and conclusions of law to the District Court. To the extent that a conclusion of law is improperly characterized as a finding of fact, it should be considered a conclusion of law. To the extent that a finding of fact is improperly characterized as a conclusion of law, it should be considered a finding of fact. *See In re Piper's Alley Co.,* 69 B.R. 382, 384 (N.D.Ill.1987).

■ Having reviewed the Trustee's causes of action in Counts IV, V, XV and XVI, all of which seek to either avoid and recover fraudulent conveyances or avoid and recover post-petition transfers, the Court finds that it has core jurisdiction to entertain these causes of action pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. The Court determines that these counts are core proceedings under 28 U.S.C. § 157(b)(3). These causes of action squarely fall within the statutory categories of core matters under 28 U.S.C. § 157(b)(2)(A), (H) and (O), and therefore, arise under various provisions of the Bankruptcy Code. The Court may hear and determine these causes of action and enter appropriate orders and judgments on these counts pursuant to 28 U.S.C. § 157(b)(1).

## II. *FACTS AND BACKGROUND*

The Debtor was an Illinois corporation and originally founded by Homer King.

Homer and Mary King are the former father-in-law and mother-in-law of Joe. Joe was previously married to the King's daughter, Janet Wilcek. In 1989, Homer King sold his shares of stock in the business to five employees. Joe was one of those purchasers. Joe eventually purchased the shares of stock from the other four stockholders and became the sole owner of the Debtor in October 1993.

The Debtor designed, made and sold point of purchase displays to and for manufacturers of products who marketed those products at retail sales locations. The Debtor's principal market targeted cigarette manufacturers. The Debtor's primary customer was R.J. Reynolds Co. ("RJR"). *See* Trustee's Exhibit No. 1. From approximately 1993 through the filing of the bankruptcy case, all stock in the Debtor was owned by Joe who operated the Debtor with the help of his brother, Earl. Joe was the president and Earl was the vice president and general counsel of the Debtor. As a result of business reversals and entry of a $728,038.36 judgment in favor of Jifram Extrusions, Inc. ("Jifram") and against the Debtor, the Debtor filed a voluntary Chapter 11 petition on June 3, 1999. *See* Trustee's Exhibit No. 77 and HKA and Earl's Exhibit No. 22. Pursuant to the Debtor's Schedule F, as of June 1, 1999, the Debtor had unsecured debt of approximately $16,000,000.00. *Id.* The Debtor's assets were valued at approximately $300,000.00. *Id.* As of September 8, 1999, pursuant to an amendment to Schedule F, the Debtor's unsecured debt was approximately $17,500,000.00. *See* Trustee's Exhibit No. 77 and HKA and Earl's Exhibit Nos. 25 and 30. The bulk of the unsecured debt was comprised of the approximate $16,000,000.00 disputed claim of the Kings and the $728,038.36 disputed claim of Jifram. *See* HKA and Earl's Exhibit No. 25 and Trustee's Exhibit No. 77. On December 30, 1999, Mary and Homer King filed a proof of claim in the sum of $15,922,982.00. *See* HKA and Earl's Exhibit No. 19.

On October 13, 1999, the Debtor filed a proposed plan and disclosure statement which met strong opposition from the Kings and Jifram who filed objections thereto. *See* HKA and Earl's Exhibit Nos. 21 and 26. On November 30, 1999, the Court gave the Debtor leave to file an amended plan and disclosure statement to address the objections and continued the adequacy hearing required under 11 U.S.C. § 1125 to February 1, 2000. The Debtor filed an amended plan and disclosure statement on January 25, 2000. Therein, the Debtor projected profits over the five-year period post-petition of approximately $621,800.00. Under both the original and amended plans, the Debtor proposed to stay in business and utilize post-petition earnings from its ongoing business to fund its operations going forward and pay the allowed claims of its pre-petition creditors. On February 22, 2000, however, the Debtor filed a motion to convert or dismiss the case wherein it alleged that it was unable to negotiate a consensual plan with the Kings and Jifram and concluded that its proposed plan would not be confirmable. On February 29, 2000, the Court converted the case to a Chapter 7 liquidation.

The Court has taken judicial notice of the Debtor's Chapter 11 plans, disclosure statements, schedules of assets and liabilities, and monthly operating reports filed in this case, which include summaries of its cash receipts and disbursements, inventory, receivables and payables. *See Frierdich v. Mottaz*, 294 F.3d 864, 870 (7th Cir.2002) (court can take judicial notice of bankruptcy schedules); *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir.1997) (court can take judicial notice of the contents of court

records). The bankruptcy court may take judicial notice of its own records, but may not infer the truth of facts contained in documents, simply because such documents were filed with the court. *See Staten Island Sav. Bank v. Scarpinito (In re Scarpinito)*, 196 B.R. 257, 267 (Bankr. E.D.N.Y.1996) (citations omitted).

The Court notes the following salient information concerning the Debtor's operations from June 1999 through February 2000 for the period while the Debtor attempted to reorganize under Chapter 11 until it voluntarily converted to a Chapter 7 liquidation.

| Month | Beginning Cash in All Accounts | Ending Balance in All Accounts | Accounts Receivable Beginning | Accounts Receivable Ending | Accounts Payable Beginning | Accounts Payable Ending |
|---|---|---|---|---|---|---|
| June 1999 | 0 | $ 1,830.28 | $ 99,372.27 | $101,646.68 | 0 | 0 |
| July 1999 | $ 1,830.28 | $ 10,385.31 | $101,646.68 | $120,176.10 | 0 | $ 52,501.01 |
| August 1999 | $ 10,385.31 | $ 3,458.55 | $120,176.10 | $179,304.44 | $ 52,501.01 | $168,819.15 |
| September 1999 | $ 3,458.55 | $ 17,200.38 | $179,304.44 | $290,444.24 | $168,819.15 | $ 66,843.93 |
| October 1999 | $ 17,200.38 | $ 68,901.58 | $290,444.24 | $268,681.93 | $ 66,843.93 | $ 63.908.75 |
| November 1999 | $ 68,901.58 | $ 96,226.45 | [1] * | * | * | * |
| December 1999 | $ 96,226.45 | $198,857.02 | $385,332.40 | $215,287.31 | $152,671.53 | $ 42,835.28 |
| January 2000 | $198,857.02 | $176,174.71 | $215,287.31 | $196,005.26 | $ 42,835.28 | $ 32,784.53 |

| February 2000 | $176,174.71 | $180,480.90 | $196,005.26 | $ 26,726.15 | $ 32,784.53 | $ 8,753.97 |
|---|---|---|---|---|---|---|

*See* HKA and Earl's Exhibit Nos. 24, 24A, 27, 28, 29, 31 and 32.

Thus, it is readily apparent from the above data, and contrary to most failed Chapter 11 reorganization attempts where the case is converted to Chapter 7, the Debtor's cash position was significantly higher at the time of conversion on February 29, 2000 than at the time of the filing of the petition. Moreover, the Debtor's post-petition and preconversion operations generated substantial amounts of collected accounts receivable from which its accounts payable were serviced and paid.

On December 29, 1999, an attorney for Homer King wrote a letter to the Debtor's attorney requesting that the Debtor fire Earl from his position in sales and as

---

**1.** This information was not contained in the filed report for the month ending November

1999. *See* HKA and Earl's Exhibit No. 27.

general counsel. *See* HKA and Earl's Exhibit No. 7. The letter confirmed that Homer King wanted, among other things, Earl's termination. On January 2 or 3, 2000, a meeting occurred at the Debtor's attorney's office. Both Earl and Joe were present. Joe then fired Earl and supposedly made the final decision to convert the Debtor's bankruptcy case to Chapter 7, to liquidate its assets and cease business operations. Shortly thereafter, Joe formalized Earl's termination with a written notice. *See* Trustee's Exhibit No. 8 and HKA and Earl's Exhibit No. 1. Pursuant to the termination notice, Earl was to be paid through January 31, 2000 as part of his severance. *Id.* Earl continued to use his computer and office at the Debtor's place of business.

On January 25, 2000, and coincidentally the same day the Debtor's amended plan and disclosure statement were filed proposing that the Debtor would stay in business, Earl and Joe traveled together to North Carolina to meet with RJR's agents at its offices. While at the meeting, Joe informed RJR that the Debtor was liquidating and would be ceasing business operations. Joe told RJR that Earl was starting a point of purchase display company named HKA and would like RJR to give its business to Earl's new company. Joe informed RJR that he would be involved in HKA at some point in the future. The Debtor paid for all expenses incurred by Joe and Earl during their trip to RJR's offices in North Carolina.

On February 3, 2000, Earl's company, HKA, received authorization from RJR to act as a vendor for RJR. *See* HKA and Earl's Exhibit No. 37. On February 9, 2000, HKA was incorporated. *See* HKA and Earl's Exhibit No 1B. Earl is the sole officer, shareholder and director of HKA. In addition, he is president and general counsel of HKA. HKA now performs substantially similar, if not identical, work for RJR as the Debtor previously performed. HKA's offices are located at the same address where the Debtor formerly operated its business from 1985 through 1994. Other key employees formerly of the Debtor are now employed by HKA in the same or a substantially similar capacity, including Brian Mahoney, Joseph LaPorte, Larry Goodman and Bradley Collins.

On February 11, 2000, Joe met with Steven Camp, president of Better Bilt Products, Inc. ("Better Bilt"), one of the Debtor's vendors, and Harry Camp, corporate secretary for Better Bilt, at Better Bilt's offices. At that meeting, Joe advised Better Bilt that the Debtor would be liquidating within a few weeks and that Better Bilt would be receiving cancellation orders from the Debtor for all pending orders. *See* Trustee's Exhibit Nos. 36 and 61. Joe further advised Better Bilt that Better Bilt would soon be receiving purchase orders from a company named HKA for those same pending orders. *See* Trustee's Exhibit No. 60. Joe specifically told Better Bilt that the new HKA orders would match the Debtor's previous orders verbatim. *See* Trustee's Exhibit Nos. 36, 60 and 61. Joe also informed Better Bilt that he had already spoken with RJR, that RJR had already agreed to switch its business to HKA and that Better Bilt could expect business as usual with HKA. At this February 11, 2000 meeting, Joe advised Better Bilt that he would not directly run HKA during the remainder of the Debtor's existence, but that he would have an ownership interest in HKA thereafter. Also at this meeting, Joe negotiated pricing with Better Bilt for the incoming and future HKA orders. HKA abided by the prices negotiated and agreed to by Joe at this meeting.

As Joe promised, the initial purchase orders HKA issued to Better Bilt were

identical to the purchase orders the Debtor had previously issued and cancelled. *See* Trustee's Exhibit Nos. 36, 60 and 61. On these initial HKA purchase orders, the delivery time was unusually short relative to the usual and customary delivery time called for in the industry. *See* Trustee's Exhibit No. 60. In fact, the delivery dates on these HKA purchase orders exactly matched the Debtor's delivery dates on the identical orders placed weeks earlier and then cancelled by the Debtor. *See* Trustee's Exhibit Nos. 36, 60 and 61. For example, some of the initial orders placed by HKA called for delivery within three or four days, whereas the customary delivery time for such orders is six to eight weeks. At the time these initial orders were placed, no one from HKA contacted Better Bilt to inquire whether Better Bilt was willing to be a vendor for HKA, or as to pricing, terms, or whether Better Bilt would be able to fill the orders in such a short time. The only reason Better Bilt was able to fill the initial orders place by HKA was because the orders were already in production pursuant to the Debtor's previous purchase orders and Better Bilt had continued production of the orders based upon the comments of Joe on February 11, 2000.

On February 14, 2000, Earl provided RJR detailed price quote information for HKA for several point of purchase display products. The pricing information contained in HKA's February 14, 2000 communication to RJR was identical to, or was at least similar to, the pricing structure in place while RJR was the customer of the Debtor, during the time Earl was vice president of the Debtor. Moreover, Earl was not involved in making this type of pricing detail while he was employed by the Debtor. Sometime before February 23, 2000, Earl prepared a business plan for HKA. *See* Trustee's Exhibit No. 10 and HKA and Earl's Exhibit No. 38. The plan

represented, among other things, that HKA had an existing agreement with a multi-billion dollar company for $3,000,000.00 in sales a year and that there might be a "unique opportunity to purchase the assets of a liquidated display company for a fraction of the ... cost." *Id.* The plan also contained financial information about the operations of a point of purchase display company. *Id.* The plan further stated that it was anticipated that HKA's phones would be operational as of February 23, 2000. *Id.*

The Debtor ordered printed materials such as quotation sheets, invoices, other business forms and business cards, which it used in its business, from Rohrer Graphic Arts, Inc. ("Rohrer"). Sometime before February 29, 2000, Joe ordered 1,000 HKA quotation forms from Rohrer. *See* Trustee's Exhibit No. 11. On February 29, 2000, Joe received those forms. *Id.* Sometime before February 25, 2000, Joe ordered 1,000 HKA two-color letterhead, 1,000 two-color matching envelopes, 500 printed second sheets and 1,000 # 10 regular window envelopes from Rohrer. *See* Trustee's Exhibit No. 12. On February 25, 2000, Joe received those materials. *Id.*

Further, sometime before March 20, 2000, Joe ordered two sets of 500 two-color HKA business cards for himself, one listing him as president, the other not listing him as having any position. *See* Trustee's Exhibit No. 14. At that time, Joe also ordered two sets of 500 two-color HKA business cards for Earl, one listing him as president and general counsel, the other listing him as vice president and general counsel. *Id.* In addition, Joe ordered 500 two-color HKA business cards each for Brian Mahoney (director of purchasing), Kathryn Magrath (administrative assistant), Bradley Collins (engineering and design), Joseph LaPorte (comptroller), Steven Boyd (account executive) and Larry

Goodman (production coordinator). *See* Trustee's Exhibit Nos. 13 and 14. All of these people were employed by the Debtor as of February 2000 and all were hired to work for HKA as of March 2000. On March 20, 2000, Joe received those business cards. *See* Trustee's Exhibit No. 13. On February 25, 2000, Rohrer issued an invoice to the Debtor, which included charges for printing 1,000 HKA two-color letterheads, 1000 two–color matching envelopes, 500 printed second sheets, 1,000 # 10 regular window envelopes and 1,000 quotation forms. *See* Trustee's Exhibit No. 46. The Debtor paid Rohrer's invoice on March 10, 2000, after it had ceased operations. *Id.* HKA used the printed material, including the business cards, that Joe ordered from Rohrer, for which the Debtor paid.

During the months of January and February 2000, the Debtor received purchase orders from customers, including RJR, and issued purchase orders to its vendors, including but not limited to, Aware Services, Better Bilt, Regal Images, Richco Plastic Co., Vindee Industries, Inc. and WM Plastics, Inc. The Debtor identified a job number on each of the purchase orders. The last digits on the Debtor's job number corresponded to the number of times the Debtor had previously made that particular product.

The Debtor cancelled all outstanding purchase orders which it could not fill by the time it closed its doors on February 29, 2000. HKA issued purchase orders to the same vendors named above with which the Debtor previously had outstanding purchase orders that the Debtor had cancelled prior to ceasing its business operations. On all the HKA purchase orders issued to the same vendors with which the Debtor previously had outstanding purchase orders that the Debtor had cancelled prior to ceasing its business operations, HKA ordered the same products in the same quantity for the same price. In addition, HKA used the same job numbering system as did the Debtor, so that HKA's job numbers were identical to the previous, cancelled purchase orders of the Debtor that requested the identical products in the identical quantity for the identical price.

For example, on March 2, 2000, HKA issued a purchase order to WM Plastics, Inc., one of the Debtor's (and later HKA's) vendors, for the same products in the same amounts for the same prices and for the same job numbers as a previous purchase order issued by the Debtor, requesting delivery on March 3, 2000. *See* Trustee's Exhibit Nos. 39 and 40. Additionally, the Debtor issued seven purchase orders to Aware Services between January 21, 2000 and February 14, 2000. *See* Trustee's Exhibit No. 4. Those purchase orders were cancelled by the Debtor, and on February 25, 2000, HKA issued seven purchase orders for the same products in the same quantity for the same price. *See* Trustee's Exhibit Nos. 5 and 6. In February and March 2000, HKA issued other purchase orders with similarly short delivery times as the foregoing examples to other former vendors of the Debtor to whom the Debtor had previously issued and then cancelled purchase orders. *See* Trustee's Exhibit Nos. 37, 38, 44, 45, 62, 63, 65, 66, 68, 69, 73 and 74.

On March 2, 2000, HKA and RJR entered into a master agreement for HKA to furnish goods and services to RJR for its point of purchase display products. *See* Trustee's Exhibit No. 2 and HKA and Earl's Exhibit No. 36. In March 2000, HKA contacted the Trustee regarding its desire to purchase some of the Debtor's assets. *See* HKA and Earl's Exhibit No. 2. Those discussion continued through June 2000. *See* HKA and Earl's Exhibit Nos. 2A, 3, 4, 5 and 6.

On April 1, 2000, Joe began working for HKA. On April 17, 2000 and April 18, 2000, Earl wrote Joe several letters offering him a position at HKA as a sales consultant with several compensation options for Joe to choose from. *See* Trustee's Exhibit Nos. 19 and 20 and HKA and Earl's Exhibits Nos. 32A and 32B. On April 19, 2000, Joe, unhappy with the compensation packages offered to him by Earl, wrote Earl a letter. *See* Trustee's Exhibit No. 21 and HKA and Earl's Exhibit No. 32C. In this letter, for which the subject was "Re: Payoff," Joe stated, inter alia: "[t]he terms I am looking for my good behavior and silence in the company I set up for you, Brian [Mahoney] and Brad [Collins] would be the following. . . ." *Id.* Among the terms Joe requested were $100,000.00 per year salary; reimbursement of his expenses up to $25,000.00; bonuses or retained earnings disbursement payments equal to that received by Earl and other employees; health, dental, disability and retirement benefits to Joe and his children; and a sales compensation package based on the percentage of gross profits at the time of the quote. *Id.* Joe signed the letter, "Joe E. Wilcek, Chump." *Id.*

Earl responded on April 20, 2000. *See* Trustee's Exhibit No. 22 and HKA and Earl's Exhibit No. 32D. He agreed to the $100,000.00 salary, the $25,000.00 expense reimbursement and the insurance benefits. *Id.* Further, Earl stated in the letter that "[a]ny involvement by you, imagined or actual, in the creation of HKA ... would have been done gratuitously and was at best ceremonial." *Id.* Joe accepted employment with HKA as a sales consultant and was paid $100,000.00 per year salary plus reimbursement of up to $25,000.00 per year in expenses. These amounts were higher than any other employee at HKA, including Earl, and matched the salary Joe was receiving while employed by the Debtor. Joe was on HKA's payroll for fifteen months. He spent almost no time at the HKA offices during 2000 and 2001. Earl testified that he consulted with Joe for a total of approximately thirty minutes during the fifteen months Joe was on HKA's payroll. In addition, Joe did not sell any HKA work to any customers or prospective customers during the fifteen months he worked for HKA.

On June 9, 2000, the Court approved the Trustee's sale of substantially all of the Debtor's tangible assets to HKA. *See* HKA and Earl's Exhibit No. 6A. On July 26, 2000, Joe was terminated by Earl at HKA. *See* HKA and Earl's Exhibit No. 33.

HKA has always performed, and continues to perform, substantially similar work for RJR and the Debtor's other former customers as the Debtor previously performed. Were the Debtor still in existence, the Debtor could be performing the same work for HKA's customers as HKA now performs. For the year 2000, HKA sold goods worth approximately $4,000,000.00 and had taxable income of $548,381.00. *See* Trustee's Exhibit No. 55.

On June 1, 2001, the Trustee filed the instant multi-count complaint against Joe, Earl and HKA. *See* HKA and Earl's Exhibit No. 15. The Trustee seeks the following relief under the various counts of the complaint: (1) Count I—deprivation of the Debtor's corporate opportunity against Earl and Joe; (2) Count II—breach of fiduciary duty by Earl and Joe; (3) Count III—corporate successor liability against HKA; (4) Count IV—avoidance and recovery of fraudulent conveyances to Joe; (5) Count V—avoidance and recovery of post-petition transfers to Joe; (6) Count XV—avoidance and recovery of fraudulent conveyances to Custom Cycle Supply by Joe; and (7) Count XVI—avoidance and recovery of post-petition transfers made to Custom Cycle Supply by Joe. *Id.*

At the close of the Trustee's case, HKA and Earl moved for entry of judgment in their favor pursuant to Federal Rule of Bankruptcy Procedure 7052(c) under Counts I, II and III of the complaint. The Court reserved ruling on this motion until the close of all the evidence. In this motion, HKA and Earl contend that the Trustee lacks standing to bring this adversary proceeding and cite *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir.1991) for the proposition that "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Id.* at 118. As a threshold matter, the Court will address this argument before addressing the remaining counts of the complaint.

## III. *DISCUSSION*

### A. *Whether the Trustee Has Standing to Bring this Adversary Proceeding*

The principal role of a trustee in bankruptcy is to collect money and other assets that may be owing to a debtor. *See Steinberg v. Buczynski*, 40 F.3d 890, 891 (7th Cir.1994). Section 704 of the Bankruptcy Code specifically sets forth a trustee's duties, which include collecting and reducing to money the property of the estate and investigating the financial affairs of the debtor. *See* 11 U.S.C. § 704(1) and (4). Among those powers, the trustee may bring claims against the debtor's fiduciaries. *See Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988) ("rights of action against officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or the shareholders derivatively before bankruptcy, becomes property of the es-

tate which the trustee alone has the right to pursue after the filing of a bankruptcy petition"); *Official Committee of Unsecured Creditors of Toy King Distribs., Inc. v. Liberty Savs. Bank, FSB (In re Toy King Distribs., Inc.)*, 256 B.R. 1, 167 (Bankr.M.D.Fla.2000). The inquiry into standing turns on whether the corporation has a claim against the alleged wrongdoer. *See Steinberg*, 40 F.3d at 892.

In *Koch*, the Seventh Circuit pointed out that a "trustee may maintain only a general claim. His right to bring a claim 'depends on whether the action vests in the trustee as an assignee for the benefit of creditors or, on the other hand, accrues to specific creditors.'" 831 F.2d at 1349 (*quoting Cissell v. American Home Assurance Co.*, 521 F.2d 790, 793 (6th Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976)). The court continued:

> [A bankruptcy trustee] has no standing to bring *personal* claims of creditors. A cause of action is "personal" if the claimant himself is harmed and no other claimant or creditor has an interest in the cause. But allegations that could be asserted by any creditor could be brought by the trustee as a representative of all creditors.

*Id.* at 1348–49; *see also Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir.1998) ("the trustee has the sole responsibility to represent the estate, by bringing actions on its behalf to marshal assets for the benefit of the estate's creditors"); *In re Outboard Marine Corp.*, 278 B.R. 778, 786 (N.D.Ill. 2002), *aff'd*, 330 F.3d 942 (7th Cir.2003) (same). "It is axiomatic that the trustee has the right to bring any action in which the debtor has an interest, including actions against the debtor's officers and directors for breach of duty or misconduct.... He also has creditor status under [11 U.S.C.] section 544 to bring suits for

the benefit of the estate and ultimately of the creditors." *Koch,* 831 F.2d at 1348 (citations omitted).

 In the present case, the Trustee is not bringing the causes of action for the personal claims of a specific creditor. Rather, she brings the instant causes of action on behalf of the bankruptcy estate for all creditors of the Debtor. All creditors have an interest in the various causes of action because recovery by the Trustee would result in a potentially higher distribution to them. After all, the bankruptcy trustee "represents not only the rights of the debtor but also the interests of the creditors of the debtor." *Koch,* 831 F.2d at 1342. The Court is bound to follow the Seventh Circuit's decisions in *Koch* and *Apostolou.*

The Court is not bound by the Second Circuit's decision in the *Wagoner* case. In any event, the *Wagoner* case does not hold, as Earl and HKA argue, that a trustee may not sue the shareholders or fiduciaries of a company for breach of fiduciary duty. Rather, *Wagoner* merely holds that the trustee may not sue unrelated third parties on behalf of the company when the company participated in the wrongdoing. 944 F.2d at 118. Earl and Joe are not unrelated third parties; they are being sued in their individual capacity as former officers and directors of the Debtor. Moreover, HKA, the company that Earl formed, is not an unrelated third party. Thus, the Court rejects Earl and HKA's argument that the Trustee lacks standing to pursue this adversary proceeding against them. The Trustee is bringing causes of action against Earl and Joe as the Debtor's fiduciaries and against HKA as the corporate entity allegedly liable as the successor to the Debtor for all of its debts.

Furthermore, the Court rejects the argument that the companion state court lawsuit filed by Mary and Homer King, creditors of the Debtor, bars the Trustee from pursuing this matter. The argument that there was "passive acquiescence" by the Trustee in the state court lawsuit, which constitutes a legal admission that the Trustee lacks standing to bring any action here on behalf of the Debtor's creditors, is disingenuous. The Trustee's standing before this Court is not based on her actions or inactions in the state court lawsuit. Accordingly, the Court rejects the argument that the Trustee does not have standing to bring Counts I, II and III of the complaint. Thus, the Court denies the motion of Earl and HKA for directed findings under Bankruptcy Rule 7052 and will address the remaining counts on their merits.

## B. Count I—Deprivation of Corporate Opportunity by Earl and Joe

 Pursuant to Count I of the complaint, the Trustee alleges that Joe and Earl, as directors and officers of the Debtor, owed the Debtor duties, including a duty of care and a duty of loyalty as fiduciaries. The Trustee further alleges that the contractual relationship with RJR existed within and grew out of the operation of the Debtor, and that the continuation of that relationship into the future constituted a corporate opportunity which belonged to the Debtor. Additionally, the Trustee contends that Joe and Earl were obligated, as fiduciaries of the Debtor, to allow the Debtor to continue the relationship with RJR and avail itself of such opportunity as a part of its business. The Trustee contends that in violation of their fiduciary obligations to the Debtor, Earl and Joe did not allow the Debtor to pursue this opportunity. As a result of their fiduciary obligations to the Debtor, the Trustee argues that Joe and Earl were prohibited from exploiting the RJR busi-

ness opportunity for their own benefit. The Trustee alleges that Earl and Joe misappropriated and usurped the opportunity from the Debtor, in violation of their respective fiduciary obligations to the Debtor.

The Trustee asks the Court to order an accounting to specifically identify all revenue realized by Earl and Joe, either directly or through HKA, from, in connection with or as a result of the relationship with RJR that was diverted from the Debtor and utilized by Earl and Joe through HKA. Further, the Trustee seeks the imposition of a constructive trust on all assets presently being held by Earl and Joe, either directly or through HKA, so that it may be determined whether assets of the Debtor are being held in furtherance of or as a consequence of the usurpation of the RJR corporate opportunity. Moreover, the Trustee asks the Court to order the return of all assets presently held or previously utilized by Earl and Joe, either directly or through HKA, in furtherance or development of, or realized from or in connection with or as a result of the usurpation of the corporate opportunity. Finally, the Trustee seeks the award of her reasonable expenses and attorneys' fees incurred in this action pursuant to 805 ILCS 5/12.60(j).

 Under Count I, the Court will look to Illinois law, which is applicable here, inasmuch as the Debtor was authorized to transact business in Illinois, its principal operations were conducted in Illinois and most of the conduct complained of occurred in Illinois. The Trustee bases her cause of action on the corporate opportunity doctrine, which prohibits a corporation's fiduciary from misappropriating corporate property and taking advantage of business opportunities belonging to the corporation. *Anest v. Audino,* 332 Ill. App.3d 468, 477–78, 265 Ill.Dec. 840, 773

N.E.2d 202, 210 (2d Dist.), *appeal denied,* 202 Ill.2d 598, 272 Ill.Dec. 339, 787 N.E.2d 154 (2002); *Dremco, Inc. v. South Chapel Hill Gardens, Inc.,* 274 Ill.App.3d 534, 538, 211 Ill.Dec. 39, 654 N.E.2d 501, 504–05 (1st Dist.), *appeal denied,* 164 Ill.2d 561, 214 Ill.Dec. 318, 660 N.E.2d 1267 (1995). The core principle is that a fiduciary will not be permitted to usurp an opportunity which was developed through the use of corporate assets. *Id.* (citation omitted). The corporate opportunity doctrine prohibits a corporation's fiduciary from taking advantage of business opportunities that are considered as "belonging," as far as the fiduciary is concerned, to the corporation. *Lindenhurst Drugs, Inc. v. Becker,* 154 Ill.App.3d 61, 67, 106 Ill.Dec. 845, 506 N.E.2d 645, 650 (2d Dist.1987) (citations omitted).

 When a corporation's fiduciary wants to take advantage of a corporate opportunity which is in the corporation's line of business, the fiduciary must first disclose and tender the opportunity to the corporation, notwithstanding the fact that the fiduciary may have believed that the corporation was legally or financially incapable of taking advantage of the opportunity. *Dremco,* 274 Ill.App.3d at 542, 211 Ill.Dec. 39, 654 N.E.2d at 507. A corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage. *Id.* 274 Ill.App.3d at 538, 211 Ill.Dec. 39, 654 N.E.2d at 505 (citations omitted); *Lindenhurst,* 154 Ill. App.3d at 67, 106 Ill.Dec. 845, 506 N.E.2d at 650 (citations omitted). The Illinois Supreme Court has stated that:

[I]f the doctrine of business opportunity is to possess any vitality, the corporation or association must be given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to

enter into a business that is reasonably incident to its present or prospective operations. If directors fail to make such a disclosure and to tender the opportunity, the prophylactic purpose of the rule imposing a fiduciary obligation requires that the directors be foreclosed from exploiting that opportunity on their own behalf.

*Kerrigan v. Unity Savs. Assoc.,* 58 Ill.2d 20, 28, 317 N.E.2d 39, 43–44 (1974).

In determining whether an officer may take advantage of a business opportunity in which a corporation is interested, courts must consider whether the corporation had an interest, actual or in expectancy, in the opportunity, and whether the acquisition thereof by the officer would hinder or defeat plans and purposes of the corporation in carrying on or developing the legitimate business for which it was created. *Lindenhurst Drugs,* 154 Ill. App.3d at 68, 106 Ill.Dec. 845, 506 N.E.2d at 650 (citation omitted). Factors to be weighed in making the determination include the manner in which the offer was communicated to the officer, the good faith of the officer, the use of corporate assets to acquire the opportunity, the financial ability of the corporation to acquire the opportunity, the degree of disclosure made to the corporation, the action taken by the corporation with reference thereto, and the need or interest of the corporation in the opportunity. *Id.* (citation omitted). Use of a director's position with the corporation to capture an opportunity alone may be enough to establish liability. *Id.* 154 Ill. App.3d at 70, 106 Ill.Dec. 845, 506 N.E.2d at 652 (citation omitted).

The business decision of a corporation not to engage in a particular line of business is beyond any questioning by the courts, as long as the corporation was given the opportunity, upon full disclosure of the facts, to decide whether to enter

into the particular line of business. *McCabe Packing Co. v. United States,* 809 F.Supp. 614, 617 (C.D.Ill.1992) (citation omitted). However, a belief on the part of the fiduciary that the corporation cannot engage in the business opportunity is not a substitute for the fiduciary's duty to present the question to the corporation for the corporation's independent evaluation. *Kerrigan,* 58 Ill.2d at 28, 317 N.E.2d at 43. Also, when a fiduciary uses a corporation's assets to develop a business opportunity, the fiduciary is estopped from denying that the resulting opportunity belongs to the corporation whose assets were misappropriated, even if it was not feasible for the corporation to pursue the opportunity or if the corporation had no expectancy in the project. *Graham v. Mimms,* 111 Ill. App.3d 751, 763, 67 Ill.Dec. 313, 444 N.E.2d 549, 557 (1st Dist.1982).

The gist of the Trustee's complaint is that Joe and Earl diverted the RJR business opportunity from the Debtor and to HKA, a new entity formed by Earl. Initially, the Court finds that both Joe and Earl, as officers of the Debtor, owed the Debtor fiduciary duties. *See Kerrigan,* 58 Ill.2d at 27, 317 N.E.2d at 43. In short, the Court finds that when Earl and Joe visited RJR on January 25, 2000 to inform it that the Debtor would be ceasing operations and that HKA would be formed and could take over the Debtor's business, they breached their fiduciary duty of loyalty owed to the Debtor. Clearly, the Debtor's relationship with RJR constituted a corporate opportunity that belonged to the Debtor. Moreover, the undisputed evidence demonstrated that the Debtor paid for Joe and Earl's trip to RJR's offices in North Carolina. Joe and Earl utilized the Debtor's assets to acquire the RJR business opportunity for the benefit of themselves and HKA. Thus, Earl and Joe usurped the RJR business opportunity, which had been devel-

oped through the use of the Debtor's corporate assets.

The uncontroverted evidence further demonstrated that the Debtor, through Joe, ostensibly made the decision to liquidate the business on January 2 or 3, 2000, but did not move to dismiss or convert the case until February 22, 2000, after filing the amended plan and disclosure statement on January 25, 2000, coincidentally the same day that Joe and Earl met with RJR representatives. In light of the Debtor's monthly operating reports, it is clear that in late 1999 and early 2000, the Debtor was generating substantial and increased cash and accounts receivable from its operations, most likely principally from its largest customer, RJR. The Court seriously questions the purported good faith business judgment to cease the Debtor's operations. At the time Joe made the determination, the Debtor's operating reports showed positive and increased monthly cash flow and substantial accounts receivable, plus tangible assets of approximately $300,000.00. In short, the Debtor was not suffering from the common failing debtor syndrome at the time of conversion. Although the Debtor faced opposition to confirmation of its plan by the Kings and Jifram, rather than continue to operate and negotiate a settlement of the objections to the plan, which projected approximately $680,000.00 in net operational profits over a five-year period post-petition, the Debtor, through Joe, with Earl's input, abandoned whatever future business opportunity it had with RJR. The RJR future business was a real and viable corporate opportunity for the Debtor, which Joe decided to forego in favor of supporting Earl's new venture.

The Trustee has clearly demonstrated that Joe, with the aid and assistance of Earl, failed to preserve or tender that opportunity for the Debtor and they,

through HKA, exploited that opportunity for future RJR business for their benefit and for the benefit of HKA. Thus, the Trustee has convincingly demonstrated that both Earl and Joe usurped the RJR business opportunity from the Debtor. Joe and Earl had exclusive control over the timing of the decisions regarding the Debtor's fate and HKA's creation. Earl and HKA were the only ones who had any opportunity to take the Debtor's relationship with RJR from the Debtor. Earl did this with Joe's assistance. The Debtor's valuable business relationship with RJR and the potential income stream it represented to the Debtor was wrongfully and improperly taken from the Debtor by its officers and fiduciaries—Joe and Earl— and given to HKA.

Because Joe was in complete control of the Debtor's fate, by moving to convert the case to a Chapter 7 liquidation, he was uniquely positioned to usurp the Debtor's opportunity to continue in business and pursue that opportunity in the form of another company. At all times during the formation of HKA, which occurred while the Debtor was still in business, the Debtor accepted orders from customers and retained vendors to fill those orders, it was agreed between Joe and Earl that Earl would be the owner, or at least one of the owners, of HKA after the Debtor was liquidated. In an effort to hide this usurpation and this concert of action between himself and Joe, Joe terminated Earl before he liquidated the Debtor, in an attempt to make it appear as though the formation of a new company was exclusively Earl's doing.

Furthermore, by liquidating the Debtor when he did, Joe attempted to make it appear that the formation of HKA occurred after the decision to liquidate was made, further adding to the false appearance that Earl, and not Joe, was in control

of HKA, that HKA was unrelated to the Debtor, and that the Debtor was no longer interested in pursuing its business in the point of purchase display industry. In fact, Joe and Earl were at all times interested in remaining in the point of purchase display industry, and took the steps they did in forming HKA when they did, and in liquidating the Debtor when they did, to create a false impression that they were not interested in usurping the Debtor's corporate opportunities in the industry.

Considering the circumstances of the timing of the Debtor's liquidation and the formation of HKA, the Court finds that the actions of Joe and Earl amounted to an unjustified usurpation of the Debtor's corporate opportunity with RJR in the point of purchase display business. As a result of Joe and Earl's unjustified usurpation of the Debtor's corporate opportunity with RJR in the point of purchase display business, the Debtor was deprived of all profits that it would have derived but for the usurpation of the corporate opportunity. Accordingly, the Court recommends that the District Court enter judgment against Joe and Earl jointly and severally and in favor of the Trustee under Count I of the complaint.

 Next, the Court must determine whether to order an accounting of all assets realized by Earl and Joe, either directly or through HKA, from, in connection with, or as a result of the relationship with RJR that was diverted from the Debtor and utilized by Joe and Earl through HKA. Whether the Trustee has a right to an accounting depends on applicable state law, which she failed to cite. *See Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (property interests are created and defined by state law). Typically, as in Illinois, a right to an accounting arises when the defendant possesses money or property which,

because of some particular relationship between himself and the plaintiff, he is obligated to surrender. 1A C.J.S. *Accounting* § 15 at 13 (1985). An accounting is an equitable remedy, and courts have broad discretion to refuse to award such a remedy to a party who has an adequate remedy at law. *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985). The Supreme Court in *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) set forth the standards for allowing an equitable accounting:

> The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in *Beacon Theaters,* the absence of an adequate remedy at law. Consequently, in order to maintain such a suit on a cause of action cognizable at law, ... the plaintiff must be able to show that the "accounts between the parties" are of such a "complicated nature" that only a court of equity can satisfactorily unravel them.

*Id.* at 478, 82 S.Ct. 894 (footnotes omitted).

 Pursuant to Illinois law, a court will take jurisdiction of an accounting action in the absence of an adequate remedy at law and if the accounting action is based upon one of the following: (1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature. *See People ex rel. Hartigan v. Candy Club,* 149 Ill.App.3d 498, 500–501, 103 Ill.Dec. 167, 501 N.E.2d 188, 190 (1st Dist.1986) (citations omitted); *Mann v. Kemper Fin. Cos., Inc.,* 247 Ill.App.3d 966, 980, 187 Ill. Dec. 726, 618 N.E.2d 317, 327 (1st Dist. 1992). A plaintiff may maintain an action for an accounting even though he has an adequate remedy at law if the accounting sought is based on breach of a fiduciary

duty. *Candy Club,* 149 Ill.App.3d at 501, 103 Ill.Dec. 167, 501 N.E.2d at 190. Under this exception, a plaintiff need not plead the inadequacy of legal remedies. *Id.*

The Court finds that the Trustee has established the requirements for an accounting. First, because the accounting is based on Earl and Joe's breach of their fiduciary duties to the Debtor, the Trustee does not have to allege an inadequate remedy at law. Moreover, the amount owed between the parties is of such a complicated nature that only a court of equity can unravel that figure. In addition, there exists a need for discovery between the parties. Consequently, the Court recommends that the District Court grant the Trustee's request for an accounting to specifically identify all revenue realized by Earl and Joe, either directly or through HKA, from, in connection with, or as a result of the relationship with RJR that was diverted from the Debtor and utilized by Earl and Joe through HKA. The Court recommends that within thirty days after the entry of the order herein, Earl and Joe shall prepare, serve on the Trustee, and file with the Court, a full and complete chronological accounting from January 25, 2000 through the date of the filing of the Court ordered accounting, including all receipts of income derived by them on behalf of HKA from the RJR business, supported by legible copies of any and all available supporting documentation, including but not limited to, cancelled checks; bills; invoices; receipts; bank, and other statements; ledgers; computer printouts; memoranda; and all other tangible evidence relating thereto in their possession or control or that of HKA's officers, directors, agents, attorneys and accountants. After the accounting is filed, the Court recommends that other hearings be scheduled as may be necessary to determine the adequacy of the accounting and the amounts owing between the parties.

■■■■ Next, the Court will address the Trustee's request for the imposition of a constructive trust. The term "constructive trust" describes a remedy, rather than the underlying cause of action. *See Health Cost Controls of Ill., Inc. v. Washington,* 187 F.3d 703, 710 (7th Cir.1999), *cert. denied,* 528 U.S. 1136, 120 S.Ct. 979, 145 L.Ed.2d 930 (2000). A constructive trust is a device to prevent unjust enrichment. *American Nat'l Bank & Trust Co. of Rockford, Ill. v. United States,* 832 F.2d 1032, 1035 (7th Cir.1987). The Illinois Supreme Court has explained the circumstances under which a constructive trust may be imposed:

> A constructive trust is generally imposed in two situations: first, where actual or constructive fraud is considered as equitable grounds for raising the trust and, second, where there is a fiduciary duty and a subsequent breach of that duty.... Some form of wrongdoing is a prerequisite to the imposition of a constructive trust.

*Suttles v. Vogel,* 126 Ill.2d 186, 193, 127 Ill.Dec. 819, 533 N.E.2d 901, 904–05 (1988) (citations omitted). If a defendant has unjustly enriched himself by fraud or breach of a fiduciary relationship, a plaintiff may seek redress by a constructive trust. *Charles Hester Enters., Inc. v. Illinois Founders Ins. Co.,* 114 Ill.2d 278, 293, 102 Ill.Dec. 306, 499 N.E.2d 1319, 1326 (1986); *Harris Trust & Savs. Bank v. Salomon Bros., Inc.,* 832 F.Supp. 1169, 1176–77 (N.D.Ill.1993) (citation omitted). In the context of corporate governance, the remedy for an officer's misappropriation of corporate assets or usurpation of corporate opportunities is restitution compelled by means of a constructive trust. *Forkin v. Cole,* 192 Ill.App.3d 409, 429, 139

Ill.Dec. 410, 548 N.E.2d 795, 808 (4th Dist. 1989).

The burden of proof on the issue whether a constructive trust should be imposed is a matter of state, not federal law. *See Davis v. Combes,* 294 F.3d 931, 936 (7th Cir.2002) (citations omitted). Illinois courts have stressed that a party seeking to do so bears a heavy burden of proof. "[T]he grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion." *Suttles,* 126 Ill.2d at 194, 127 Ill.Dec. 819, 533 N.E.2d at 905. Each element of the wrongdoing giving rise to the constructive trust must be established by clear and convincing evidence. *Rapp v. Bowers,* 38 Ill.App.3d 668, 671, 348 N.E.2d 529, 533 (2d Dist.1976). To be "clear and convincing," the evidence presented must " 'leave[ ] no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question.' " *Parker v. Sullivan,* 891 F.2d 185, 188 (7th Cir.1989) (*quoting Estate of Ragen,* 79 Ill. App.3d 8, 14, 34 Ill.Dec. 523, 398 N.E.2d 198, 203 (1st Dist.1979)).

The consequences of the imposition of a constructive trust are simple. The party in wrongful possession of the property becomes an involuntary trustee, and "[t]he sole duty of the constructive trustee is to transfer title and possession of the wrongfully acquired [or possessed] property to the beneficiary." *Suttles,* 126 Ill.2d at 193, 127 Ill.Dec. 819, 533 N.E.2d at 904 (citation omitted). The party in wrongful possession holds the property for the benefit of the party to whom the property justly belongs. *Candy Club,* 149 Ill. App.3d at 502, 103 Ill.Dec. 167, 501 N.E.2d at 191.

The Court finds that Joe and Earl breached their fiduciary duties to the Debtor by usurping the Debtor's business opportunity with RJR. Restitution can be compelled by means of a constructive trust. Clearly, the breach of fiduciary duties by Joe and Earl warrants the imposition of a constructive trust under Illinois law. *See Amendola v. Bayer,* 907 F.2d 760, 763 (7th Cir.1990). The Court recommends that the District Court impose a constructive trust on all assets presently being held by Earl and Joe, either directly or through HKA, so that it may be determined whether assets of the Debtor are being held in furtherance of, or as a consequence of, the usurpation of the RJR corporate opportunity.

Next, the Court must address the Trustee's request for her attorneys' fees pursuant to 805 ILCS 5/12.60(j). Under § 12.60(j), "[i]f the court finds that a party to any proceeding under Section 12.50, 12.55, or 12.56 acted arbitrarily, vexatiously, or otherwise not in good faith, it may award one or more other parties their reasonable expenses, including counsel fees ... incurred in the proceeding." 805 ILCS 5/12.60(j). Sections 12.50, 12.55 and 12.56 provide grounds for: (1) judicial dissolution in actions by nonshareholders; (2) shareholder remedies; public corporations; and (3) shareholder remedies; non-public corporations. The Trustee is not a party to a proceeding under §§ 12.50, 12.55 or 12.56 as required by § 12.60(j). In fact, the Trustee's complaint does not allege a cause of action under any of these sections. Consequently, the Court recommends that the District Court deny the Trustee's request for her attorneys' fees under 805 ILCS 5/12.60(j).

## C. *Count II—Breach of Fiduciary Duties by Earl and Joe*

Pursuant to Count II of the complaint, the Trustee alleges that Earl and Joe breached the fiduciary duties they owed to the Debtor. The Trustee maintains that as a result of their alleged

breaches, the Debtor was damaged by its loss of the ability to pursue the corporate opportunity with RJR, which Earl and Joe usurped for their own benefit. The Trustee seeks judgment in her favor and against Earl and Joe in excess of $17,000,000.00, plus an award of punitive damages against Earl and Joe each in the sum of $500,000.00 as punishment for their respective breaches of fiduciary duties to the Debtor.

■ Under Illinois law, corporate officers and directors are fiduciaries of the corporation and have duties of good faith, loyalty and honesty. *See Brown v. Tenney,* 125 Ill.2d 348, 360, 126 Ill.Dec. 545, 532 N.E.2d 230, 235 (1988); *Daley v. Chang (In re Joy Recovery Tech. Corp.),* 257 B.R. 253, 274 (Bankr.N.D.Ill.2001) (citations omitted). They may not enhance their personal interests at the expense of the corporation's interests. *Id.* (citation omitted). Corporate officers owe a fiduciary duty of loyalty to their corporate employer not to actively exploit their positions within the corporation for their own personal benefit or hinder the ability of a corporation to continue the business for which it was developed. *Veco Corp. v. Babcock,* 243 Ill.App.3d 153, 160–61, 183 Ill. Dec. 406, 611 N.E.2d 1054, 1059 (1st Dist.), *appeal denied,* 152 Ill.2d 581, 190 Ill.Dec. 912, 622 N.E.2d 1229 (1993) (citations omitted); *E.J. McKernan Co. v. Gregory,* 252 Ill.App.3d 514, 529, 191 Ill.Dec. 391, 623 N.E.2d 981, 992–93 (2d Dist.1993) (citations omitted). Specifically, officers should not place themselves "in a position where their own individual interests might interfere with the performance of their duties to the corporation and [they should] not use their positions for their own personal gain." *Levy v. Markal Sales Corp.,* 268 Ill.App.3d 355, 365, 205 Ill.Dec. 599, 643 N.E.2d 1206, 1214 (1st Dist.1994), *ap-*

*peal denied,* 161 Ill.2d 527, 208 Ill.Dec. 361, 649 N.E.2d 417 (1995).

■ As president and owner of the Debtor, Joe owed the Debtor a fiduciary duty of good faith, loyalty and honesty, which required, among other things, that Joe place the Debtor's interest over his own personal interest. As vice president and general counsel of the Debtor, Earl owed the Debtor a fiduciary duty of good faith, loyalty and honesty, which required, among other things, that Earl place the Debtor's interest over his own personal interest. Earl argues that as of January 3, 2000, the date Joe sent him a letter of termination, he no longer owed any duties to the Debtor. An officer's resignation will not sever liability for transactions completed after termination of the officer's association with the corporation, but which began during the existence of the relationship or that were founded on information gained during the relationship. *McKernan,* 252 Ill.App.3d at 531, 191 Ill.Dec. 391, 623 N.E.2d at 994; *Veco,* 243 Ill.App.3d at 165, 183 Ill.Dec. 406, 611 N.E.2d at 1062 (citations omitted). It is undisputed that Earl's new corporation, HKA, picked up the RJR business where the Debtor left off. Further, in late January 2000, before the motion to dismiss or convert was filed, and while Joe and Earl were still on the Debtor's payroll using the Debtor's assets to conduct ongoing business, Earl and Joe steered the RJR business opportunity from the Debtor to HKA for Earl and Joe's benefit and profit. The documentary evidence demonstrated that Earl's employment with and compensation from the Debtor did not end until January 31, 2000 (Trustee's Exhibit No. 8) and that he performed services for the Debtor after the date of the January 3, 2000 termination letter. *See* Trustee's Exhibit No. 9. Accordingly, the Court finds that Earl continued to owe the Debtor a fiduciary duty

until January 31, 2000. Thus, by traveling to North Carolina to solicit and steer the RJR business away from the Debtor and to his newly formed company, Earl clearly breached his fiduciary duty of loyalty to the Debtor.

Notwithstanding these duties, and in breach of these duties, Joe and Earl made concrete plans, and had an agreement with one another, to open up a new point of purchase display company, which would service the same clients that the Debtor serviced, use the same vendors the Debtor used and even complete orders that the Debtor had pending prior to its liquidation. In essence, this new company would supplant the Debtor in the point of purchase display industry. The Court concludes that Joe and Earl breached their fiduciary duties to the Debtor and engaged in proscribed self-dealing and usurpation of the Debtor's corporate opportunity with RJR.

 Additionally, the Court questions the exercise of the Debtor's business judgment in moving to liquidate the case when the Debtor's operating reports showed a significant positive cash flow and increased accounts receivable. The business judgment rule is a presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interest of the corporation. *Ferris Elevator Co., Inc. v. Neffco, Inc.*, 285 Ill.App.3d 350, 354, 220 Ill.Dec. 906, 674 N.E.2d 449, 452 (3d Dist. 1996) (citations omitted). The burden of proof is on the party challenging a corporate decision made by an officer or director, to present facts rebutting the presumption, under the business judgment rule, that the decision was made on an informed basis and with an honest belief that the course taken was in the best interests of the corporation. *Id.* 285 Ill. App.3d at 355, 220 Ill.Dec. 906, 674 N.E.2d

at 453. There is sufficient evidence in the record to show that Joe's ultimate decision to liquidate the Debtor, which was aided and abetted by Earl, after filing the amended plan and disclosure statement, and coupled with the improved cash and accounts receivable position of the Debtor in late 1999 and early 2000, was in violation of the business judgment rule, as well as a breach of Joe and Earl's fiduciary duties owed to the Debtor. The Trustee has presented sufficient facts to overcome the presumption in favor of Earl and Joe's decision to liquidate the Debtor, given the fact that the Debtor's cash position and accounts receivable were increasing, which were principally attributable to the ongoing RJR business. This RJR business was the underpinning of the amended plan and disclosure statement, which projected net profits of approximately $621,800.00 over the five years post-petition. Thus, the Court concludes that the decision to liquidate the Debtor was not made in good faith or in the best interest of the Debtor or its creditors, and Joe and Earl's subsequent actions to steer the RJR business to HKA constituted a breach of their fiduciary duties to the Debtor.

In conclusion, the Court finds that the Trustee presented adequate evidence that Earl and Joe violated their fiduciary duties when they deprived the Debtor of its ongoing business opportunity with RJR. Accordingly, the Court recommends that the District Court enter judgment in favor of the Trustee and against Earl and Joe under Count II of the complaint.

 Next, the Court must determine the amount of damages that should be assessed against Joe and Earl. The Trustee seeks an award in her favor and against Joe and Earl in excess of $17,000,000.00. The Trustee arrived at this figure based on the claims filed in the Debtor's case. However, she failed to cite

any statutory or case authority in support of her position. Once a party has proven that she has been damaged, she needs to show the amount of damages with reasonable certainty. *See Doe v. United States,* 976 F.2d 1071, 1085 (7th Cir.1992) (citing Illinois law), *cert. denied,* 510 U.S. 812, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993); *Adams Apple Distrib. Co. v. Papeleras Reunidas, S.A.,* 773 F.2d 925, 930 (7th Cir.1985) (citing Illinois law). A damage award cannot be based on mere speculation, guess or conjecture. *Id.* Illinois law does not require lost profits to be proven with absolute certainty, but they must be established "with a reasonable degree of certainty." *Lester v. Resolution Trust Corp.,* 994 F.2d 1247, 1252 (7th Cir.1993) (*quoting Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 316, 113 Ill.Dec. 252, 515 N.E.2d 61, 66 (1987)). However, recovery of lost profits cannot be based upon conjecture, or sheer speculation. *Midland,* 118 Ill.2d at 316, 113 Ill. Dec. 252, 515 N.E.2d at 66 (citation omitted).

The Court recommends that the District Court not utilize the Trustee's requested $17,000,000.00 as a measure of damages. The Court disagrees with the Trustee's assertion that the proper measure of damages under Count II equals the amount of claims filed in the Debtor's case. The Trustee does not cite any case authority for this proposition, and the Court finds the $17,000,000.00 figure an improper measure of damages under Illinois law. Rather, that measure would be more appropriate under the de facto merger theory of Count III.

An appropriate measure of damages under Count II is the Debtor's lost profits. The Court may look to the profits made by HKA since it came into existence. Those profits, reported as taxable income for tax year 2000, amounted to $548,381.00, and

have not been provided for tax years 2001 and 2002. Further, the Debtor's amended plan and disclosure statement projected net profits of approximately $680,000.00 over the five year period post-petition. The Court recommends that the actual proven profits earned by HKA for tax year 2000 be utilized as the measure of damages as a result of Joe and Earl's breach of their fiduciary duties. Based upon these figures, the Court recommends that the District Court award the Trustee actual damages in the sum of $500,000.00 because most of the former profits of the Debtor, and the initial profits of HKA, were derived from the RJR business.

Next, the Trustee seeks the award of punitive damages against both Earl and Joe in the sum of $500,000.00 each as punishment for their breach of fiduciary duties to the Debtor. Illinois views punitive damages as a punishment. *Kochan v. Owens–Corning Fiberglass Corp.,* 242 Ill.App.3d 781, 797, 182 Ill.Dec. 814, 610 N.E.2d 683, 693 (5th Dist.), *appeal denied,* 152 Ill.2d 561, 190 Ill.Dec. 891, 622 N.E.2d 1208 (1993). "[T]he nature of punitive damages in Illinois is clearly singular—it is *punishment* for the defendant." *Hazelwood v. Illinois Central Gulf R.R.,* 114 Ill.App.3d 703, 712, 71 Ill.Dec. 320, 450 N.E.2d 1199, 1207 (4th Dist.1983) (citation omitted). "That punishment is designed in turn to promote three purposes: (1) to act as retribution against the defendant; (2) to deter the defendant from committing similar wrongs in the future; and (3) to deter others from similar conduct." *Id.* (citation omitted). Important considerations in reviewing a punitive damages award include "the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant." *Deal v. Byford,* 127 Ill.2d 192, 204, 130 Ill.Dec. 200, 537 N.E.2d 267, 272 (1989) (citations omitted). Punitive damages should be

large enough to provide retribution and deterrence, but should not be so large that the award destroys the defendant. *Hazelwood*, 114 Ill.App.3d at 713, 71 Ill.Dec. 320, 450 N.E.2d at 1207.

■ The Court recommends that the District Court assess punitive damages against Joe and Earl jointly and severally in the amount of $500,000.00. First, the Court finds the conduct of Joe and Earl sufficiently egregious to warrant the imposition of such punitive damages. Joe and Earl acted in concert when the decision to liquidate the Debtor was made, Earl was terminated from the Debtor's employ and Earl started HKA and took over the Debtor's business opportunity with RJR. The Court finds that Joe and Earl calculated these steps in violation of their fiduciary duties in order to deprive the Debtor of the RJR business. This behavior clearly warrants punishment. Second, the Trustee failed to present any evidence regarding Joe and Earl's financial status. This oversight, however, is not fatal to the imposition of punitive damages. *See Deal*, 127 Ill.2d at 204–05, 130 Ill.Dec. 200, 537 N.E.2d at 272. "Evidence regarding the financial status of a defendant is simply one relevant consideration to be weighed by the judge ... in determining an appropriate award of punitive damages." *Id.* Finally, the potential liability of Joe and Earl for the same or similar wrongs is not great enough to make this award excessive. The Trustee alone has the right to pursue actions against officers and directors of a corporation for breach of fiduciary duties after the filing of a bankruptcy petition. *See Koch*, 831 F.2d at 1343. Hence, there will be no similar causes of action that they will be required to defend and potentially be liable therefor.

■ Furthermore, without citation to any statute or case law, the Trustee seeks the award of her court costs. Pursuant to Federal Rule of Bankruptcy Procedure 7054(b), "[t]he court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provide." Fed. R. Bankr.P. 7054(b). The Court knows of no statute or Bankruptcy Rule that would not provide for the allowance of costs to the Trustee. The Court may award a prevailing party taxable costs pursuant to 28 U.S.C. § 1920, which provides:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

28 U.S.C. § 1920.

■ The Court has broad discretion to determine whether and to what extent to award costs to prevailing parties. *See Barber v. Ruth*, 7 F.3d 636, 644 (7th Cir. 1993). There is a strong presumption favoring the award of costs to the prevailing party. *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 945 (7th Cir.1997). Allowable costs, however, are limited to the categories in § 1920 and expenses that

are not authorized by statute must be borne by the party incurring them. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441–45, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). The losing party must satisfy a heavy burden when asserting that he should be excused from paying costs and affirmatively establish that the costs either fall outside the parameters of § 1920, were not reasonably necessary to the litigator, or that the losing party is unable to pay. *See Muslin v. Frelinghuysen Livestock Managers, Inc.*, 777 F.2d 1230, 1236 (7th Cir.1985).

The Court recommends that the District Court assess the Trustee's taxable costs against Joe and Earl jointly and severally pursuant to 28 U.S.C. § 1920. The Trustee shall submit a bill therefor pursuant to Local Bankruptcy Rule 7054–1 within thirty days hereof.

### D. *Count III—Corporate Successor Liability Against HKA*

Pursuant to this count of the complaint, the Trustee argues that based upon the circumstances surrounding HKA's formation and the voluntary liquidation of the Debtor, HKA is either a mere continuation of the Debtor or the transactions and relationship between HKA and the Debtor constitute a "de facto merger" between the two companies, thereby imposing liability for the Debtor's debts on HKA. The Trustee maintains that the following factors, taken together, demonstrate that HKA is responsible for all the liabilities and obligations of the Debtor, including those owing to the Debtor's creditors: (1) in June 2000, HKA purchased from the Trustee substantially all of the tangible assets of the Debtor and proceeded to continue the business enterprise of HKA with the same customer that was the primary customer of the Debtor; (2) HKA's offices are located at the same address out of which the

Debtor formerly operated its business from 1985 through 1994; (3) Earl and Joe were the officers and directors of the Debtor and controlled and directed the operations of the Debtor, and Earl and Joe are the officers and directors of HKA and currently control and direct the business operations of HKA; (4) many former key employees of the Debtor are now employed by HKA in the same or a substantially similar capacity; (5) the familial relationship between Earl and Joe provides the requisite nexus to support the finding that there is a continuity of shareholders between the Debtor and HKA; (6) within weeks of the formation of HKA, the Debtor voluntarily converted its bankruptcy reorganization into a liquidation and ceased its business operations; and (7) HKA has paid invoices addressed to the Debtor which were in existence before HKA was formed. The Trustee asks the Court to declare HKA a successor in liability to the Debtor and requests the entry of a judgment in her favor and against HKA in excess of $17,000,000.00, with costs taxed to HKA, Earl and Joe.

Generally, under Illinois law, when a company sells its assets to another company, the new company is not liable for the debts and liabilities of the old company merely by reason of its succession. *Hoppa v. Schermerhorn & Co.*, 259 Ill.App.3d 61, 64, 196 Ill.Dec. 877, 630 N.E.2d 1042, 1045 (1st Dist.1994); *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir.1990) (applying Illinois law). There exists four exceptions to this general rule: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; of (4) where the transaction is for the fraudulent purpose of escap-

ing liability for the seller's obligations. *Id.* at 1325–26 (citation omitted); *Vernon v. Schuster*, 179 Ill.2d 338, 345, 228 Ill.Dec. 195, 688 N.E.2d 1172, 1175–76 (1997) (citations omitted); *Park v. Townson & Alexander, Inc.*, 287 Ill.App.3d 772, 774, 223 Ill.Dec. 163, 679 N.E.2d 107, 109 (3d Dist.), *appeal denied*, 174 Ill.2d 568, 227 Ill.Dec. 8, 686 N.E.2d 1164 (1997) (citations omitted); *Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill.App.3d 241, 248, 214 Ill.Dec. 1029, 662 N.E.2d 595, 599 (1st Dist.1996) (citations omitted). The first exception is inapplicable here. There was no express or implied agreement by HKA to assume the Debtor's liabilities. HKA was a newly formed corporation that was not incorporated until after the Debtor's case converted to Chapter 7.

The second exception, which the Trustee argues applies here, has been interpreted to include a de facto merger. *See Kaleta v. Whittaker Corp.*, 221 Ill. App.3d 705, 709, 164 Ill.Dec. 651, 583 N.E.2d 567, 571 (1st Dist.1991), *appeal denied*, 144 Ill.2d 634, 169 Ill.Dec. 142, 591 N.E.2d 22 (1992). In order to establish a de facto merger, the following factors must be present: (1) there is a continuity of the business enterprise between seller and buyer, including continuity of management, employees, location, general business operations and assets; (2) there is a continuity of shareholders, in that shareholders of the seller become shareholders of the buyer so that they become a constituent part of the buyer corporation; (3) the seller ceases operations and dissolves as soon as possible after the transaction; and (4) the buyer assumes those liabilities and obligations necessary for the uninterrupted continuation of the seller's business. *Id.* (*citing Nguyen v. Johnson Mach. & Press Corp.*, 104 Ill.App.3d 1141, 1143, 60 Ill.Dec. 866, 433 N.E.2d 1104, 1106–07 (1st Dist.1982)); *Morgan Marshall*, 278 Ill.

App.3d at 248, 214 Ill.Dec. 1029, 662 N.E.2d at 599–600 (citations omitted). In determining whether a de facto merger has occurred, the most important factor to consider is the identity of ownership of the new and former corporations. *Nilsson v. Continental Mach. Mfg. Co.*, 251 Ill.App.3d 415, 418, 190 Ill.Dec. 579, 621 N.E.2d 1032, 1034–35 (2d Dist.1993).

The "mere continuation" exception is akin to a corporate reorganization where the corporation has, in effect, "put on a new coat." *Id.* 251 Ill.App.3d at 418, 190 Ill.Dec. 579, 621 N.E.2d at 1034. "Illinois courts have indeed recognized that the de facto merger and mere continuation exceptions to successor corporation nonliability are 'inseparable' ... and that a continuity of stock ownership is critical to a finding of successor liability under either theory." *Id.* (*citing Green v. Firestone Tire & Rubber Co., Inc.*, 122 Ill. App.3d 204, 210, 77 Ill.Dec. 591, 460 N.E.2d 895, 900 (2d Dist.1984)). However, the two concepts are not indistinguishable. *Nilsson*, 251 Ill.App.3d at 418, 190 Ill.Dec. 579, 621 N.E.2d at 1034. The mere continuation exception applies where a corporate reorganization has taken place. *Id.* (citation omitted). A merger, on the other hand, involves the combining of two existing corporations into a single successor corporation. *Id.* 251 Ill.App.3d at 418, 190 Ill.Dec. 579, 621 N.E.2d at 1034–35 (citation omitted). Illinois courts have consistently required continuity of stock ownership before imposing successor liability under either theory. *Id.* (citations omitted).

The Court finds that the Trustee's theory of de facto merger must fail. The evidence failed to show that two existing corporations combined into a single successor corporation. However, even if the Court were to find that the Trustee could pursue the de facto merger theory, the

Court must deny this theory for one critical reason-the absence of continuity of stock ownership. It is undisputed that Joe owned 100% of the shares of the Debtor at all relevant times. The Trustee concedes that Joe was not proven to be a shareholder of HKA. The evidence demonstrated that Earl, on the other hand, owned all of the shares of HKA. The Illinois courts have not addressed the issue of continuity of ownership where the alleged successor corporation is owned and managed by a different individual than the alleged predecessor corporation, even where they are brothers. Thus, the Court cannot recommend that the Illinois de facto merger rule properly applies as the Trustee argues.

The Trustee argues that the familial relationship between Joe and Earl demonstrates that the Debtor and HKA are virtual substitutes for one another. The Trustee argues that the situation at bar is akin to the facts in *Morgan Marshall,* 278 Ill.App.3d 241, 214 Ill.Dec. 1029, 662 N.E.2d 595. The Court, however, finds that the facts in that case are inapposite to the matter at bar. Ownership of shares of stock by a spouse have been attributed to the other spouse under limited circumstances, not applicable here. *Id.* 278 Ill. App.3d at 249, 214 Ill.Dec. 1029, 662 N.E.2d at 600 (continuity of shareholders existed where a spouse received an 80% interest gratuitously in a company in which her spouse was the chief executive officer); *see also Park v. Townson,* 287 Ill.App.3d at 774–75, 223 Ill.Dec. 163, 679 N.E.2d at 109–110 (continuity of shareholders existed where a spouse was 100% shareholder of one entity and 50% shareholder of the other, and where the active management of the two corporations was identical). The Court will not extend the holding of these cases to the situation at bar where the predecessor and successor corporations are managed and owned by estranged brothers.

The Trustee did demonstrate, however, that HKA performs identical work as the Debtor, for the same customers, including the Debtor's principal customer, RJR. It is undisputed that HKA did business with most of the Debtor's former customers and vendors, including RJR, Aware Services, WM Plastics, Inc., Economic Plastic Coating, Inc., Total Plastics, Inc., The Finishing Company, Schiffmayer Plastics Corp., Richco, Inc., Professional Packaging Concepts, Inc., Ad–Vantage, Unlimited, Inc., Regal Images, Inc. and Rohrer. Further, HKA assumed pending purchase orders issued and cancelled by the Debtor. Additionally, the Trustee established that HKA operates out of the same address from which the Debtor operated for almost ten years from 1985 through 1994. Moreover, with the exception of Joe, who was not hired by HKA until April 2000, all of the Debtor's key employees were hired by HKA in the same positions, with the same responsibilities, including Brian Mahoney, Joseph LaPorte, Larry Goodman and Bradley Collins.

In fact, Joe represented to one of the Debtor's vendors, Aware Services, that he would be the owner of the new company formed in the wake of the Debtor's liquidation. Barry Dahlberg, president of Aware Services, testified that he first learned of HKA when someone from the Debtor told him that it was being set-up as HKA. Likewise, in February 2000, Joe told Richard Rohrer, the principal of Rohrer, a printer who did work for the Debtor, that the Debtor was changing its name to HKA when Joe ordered business cards for HKA.

Further, HKA used the same dental insurance policy as the Debtor. Joseph LaPorte testified that he unilaterally made this arrangement and did so, in retrospect, in error. *See* Trustee's Exhibit Nos. 16, 17 and 18. Likewise, the group long-term

disability plan for HKA was the identical plan with the same number as that which was in place for the Debtor. *See* Trustee's Exhibit Nos. 52 and 53.

Joe's salary was the same at HKA as it was at the Debtor. Further, Earl testified that he chose the name HKA to take advantage of the similarity between the names of the Debtor and HKA. In fact, HKA was a nickname to which the Debtor was referred to by customers, vendors and employees. Further, Joe testified that he encouraged customers and vendors alike to give their business to HKA and told vendors and customers that he would be working at HKA when the Debtor's business was wound up. Larry Goodman testified that there were meetings in January and February 2000 in which the subject of the formation of a new company was discussed by Joe. According to Larry Goodman, Joe told the employees that everyone would be moving to the new company and that Earl and Joe would be president and vice president of the new business venture.

The Court finds that the Trustee has established, based on the evidence adduced at trial, that there was a continuity of the business enterprise between the Debtor as seller and HKA as buyer, including continuity of employees, general business operations and assets. However, this is insufficient to demonstrate a de facto merger, absent continuity of stock ownership.

Moreover, absent continuity of stock ownership, the Court cannot find that HKA is merely a continuation of the Debtor. Hence, the Trustee's theory that HKA was a mere continuation of the Debtor must also fail. The Court finds that HKA does not represent a "new coat" for the liquidated Debtor. Once again, the absence of continuity of stock ownership is fatal to the Trustee's argument. While the Trustee may have demonstrated other factors necessary to establish the mere continuation exception, the most important factor—continuity of stock ownership—has not been demonstrated.

■ Next, the Court finds that the Trustee failed to prove that HKA was formed for the fraudulent purpose of escaping the Debtor's liability. The Court disagrees with the Trustee's assertion that the cessation of the Debtor and the creation of HKA was a fraud perpetrated by two siblings in a cooperative effort to rid themselves of the Debtor's debt while continuing to do business in the same industry. Breach of their fiduciary obligations to the Debtor and their attendant usurpation of the Debtor's existing business with RJR does not necessarily equate with fraud. The fact that Joe decided to liquidate the Debtor's assets and cease business operations, in light of its large amount of debt and the opposition of the Kings and Jifram, was a business judgment, albeit a bad one. That Joe and Earl usurped the Debtor's ongoing business opportunity with RJR and steered that business to HKA constitutes a breach of their fiduciary duties to the Debtor, but does not rise to the level of fraud for the purpose of escaping the Debtor's liability. Accordingly, the Court recommends that the District Court enter judgment in favor of HKA pursuant to Count III of the complaint.

**E. *Count IV—Avoidance and Recovery of Fraudulent Conveyances to Joe***

Pursuant to this count of the complaint, the Trustee argues that within one year prior to the filing date of the bankruptcy petition, the Debtor transferred, or caused, or allowed to be transferred to Joe, property in which the Debtor had an interest. These prepetition transfers to "Joe," "Cash," and "Janet Wilcek," Joe's wife at that time, were as follows: (1) check no. 014628 on June 15, 1998 in the sum of

$1,163.10 payable to Joe; (2) check no. 014627 on June 15, 1998 in the amount of $2,000.00 payable to Janet Wilcek; (3) check no. 014630 on June 16, 1998 in the sum of $28,118.61 payable to Joe; (4) check no. 014699 on July 1, 1998 in the amount of $1,163.10 payable to Joe; (5) check no. 014700 on July 1, 1998 in the amount of $2,000.00 payable to Jan Wilcek; (6) check no. 014887 on September 5, 1998 in the sum of $400.00 payable to Cash; (7) check no. 014891 on September 10, 1998 in the amount of $400.00 payable to Joe; (8) check no. 014994 on October 23, 1998 in the amount of $500.00 payable to Joe; (9) check no. 015043 on November 11, 1998 in the amount of $500.00 payable to Joe; and (10) check no. 015122 on December 7, 1998 in the sum of $1,000.00 payable to Joe. *See* Trustee's Group Exhibit No. 78. These transfers total $37,244.81. *Id.*

The Trustee argues that the Debtor made these transfers to Joe with actual intent to hinder, delay or defraud any entity to which the Debtor was or became indebted on or after the dates of the transfers. Also, the Trustee maintains that the Debtor was insolvent at the time of the transfers and that the Debtor did not receive a reasonably equivalent value in exchange for the transfers. Moreover, the Trustee alleges that after payment of these transfers to Joe, the remaining assets of the Debtor were unreasonably small to operate the business of the Debtor and that the Debtor was unable to pay its debts as they became due. Alternatively, the Trustee argues that the transfers were made to Joe, an insider, for an antecedent debt, at a time when the Debtor was insolvent, and Joe knew the Debtor was insolvent.

The Trustee seeks to avoid the prepetition transfers in the aggregate amount of $37,244.81 as fraudulent conveyances pursuant to 11 U.S.C. § 548(a) and recover them from Joe under 11 U.S.C. § 550. Alternatively, the Trustee seeks to avoid the transfers as fraudulent conveyances pursuant to the Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* In addition, the Trustee seeks interest, costs and attorneys' fees.

First, the Trustee seeks to avoid the transfers pursuant to § 548(a)(1), which provides in relevant part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, ... indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer ...; and

(ii)(I) was insolvent on the date that such transfer was made ..., or became insolvent as a result of such transfer ...;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1).

The cause of action under § 548(a)(1)(A) is commonly referred to as "actual fraud" because of the element of the debtor's actual intention to hinder, delay or defraud creditors. *In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1394 (7th Cir.

1996). Section 548(a)(1)(B) is often called "constructive fraud" because it omits any element of intent. *Id.* One decision has described the differences between the two causes of action under § 548(a)(1):

> The focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency are required. Culpability on the part of ... the transferees is not essential.
>
> Unlike constructively fraudulent transfers, the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question whether the transfer is actually fraudulent.... Conversely, the transferor's intent is immaterial to the constructively fraudulent transfer in which the issue is the equivalence of the consideration coupled with either insolvency, or inadequacy of remaining capital, or inability to pay debts as they mature.

*In re Cohen,* 199 B.R. 709, 716–17 (9th Cir. BAP 1996). "Fraudulent conveyance law protects creditors from last-minute diminutions of the pool of assets in which they have interests." *Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890, 892 (7th Cir.1988).

▆▆▆▆ Badges of fraud, the existence of which can be used to infer actual intent to defraud under § 548(a)(1)(A), include the following: (1) absconding with the proceeds of the transfer immediately after their receipt; (2) absence of consideration when the transferor and transferee know that outstanding creditors will not be paid; (3) huge disparity in value between the property transferred and the consideration received; (4) fact that the transferee was an officer, or agent or creditor of an officer of corporate transferor; (5) insolvency of the debtor; and (6) existence of a special relationship between the debtor and the transferee. *Carmel v. River Bank Am. (In re FBN Food Servs., Inc.),* 175 B.R. 671 (Bankr.N.D.Ill.1994), *aff'd,* 185 B.R. 265, 275 (N.D.Ill.1995), *aff'd,* 82 F.3d 1387 (7th Cir.1996). Where the transferee is an insider of the debtor and is in a position to control the disposition of property of the debtor, the transferee's intent is imputed to the debtor. *Id.* 185 B.R. at 275 (transactions with insiders must be rigorously scrutinized).

▆▆▆▆ To obtain relief under § 548(a)(1)(B), the Trustee must establish not only that the transfers were for less than a reasonably equivalent value, but also that the Debtor was insolvent at the time of the transfers or became insolvent as a result of the transfers. *Dunham v. Kisak,* 192 F.3d 1104, 1109 (7th Cir.1999). The Bankruptcy Code uses a balance sheet approach to insolvency. *Steege v. Affiliated Bank/North Shore Nat. (In re Alper–Richman Furs, Ltd.),* 147 B.R. 140, 154 (Bankr.N.D.Ill.1992). Under that standard, the Court looks to whether a debtor's assets exceeded its liabilities at the time of a challenged transfer. *Id.*

Determination of reasonably equivalent value under § 548(a)(1)(B) is a two-step process. *Anand v. National Republic Bank of Chicago,* 239 B.R. 511, 516–17 (N.D.Ill.1999). The Court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave. *Id.* at 517 (citations omitted). The second inquiry, whether what the debtor gave up was reasonably equivalent to what he received, is more difficult. *Id.*

▆▆▆▆ The Bankruptcy Code does not define the term "reasonably equivalent value." Whether "reasonably equivalent value" has been given is a question of fact. *In re Crystal Med. Prods., Inc.,* 240 B.R. 290, 300 (Bankr.N.D.Ill.1999). The factors

utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at an arm's length; and (4) the good faith of the transferee. *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir.1997); *Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*, 238 B.R. 758, 773 (Bankr.N.D.Ill.1999). There is no fixed formula for determining reasonable equivalence, but will depend on all the facts of each case, an important element being fair market value. *Barber*, 129 F.3d at 387. The Trustee bears the burden of proof as to all elements of § 548. *See FBN Food Servs.*, 175 B.R. at 682.

The Trustee argues that a total of ten checks made by the Debtor constitute fraudulent conveyances under § 548(a)(1). *See* Trustee's Group Exhibit No. 78. Eight of those checks were made payable to "Joe" or "Cash." Two checks were made payable to "Janet Wilcek," Joe's wife. The Court finds that the Trustee has demonstrated that the eight transfers made by the Debtor to "Joe" or "Cash" in the aggregate sum of $33,244.81 constitute fraudulent conveyances under § 548(a)(1)(A). The Trustee has met her burden of proof as to each and every element.

With respect to the two checks in the amounts of $2,000.00 made payable to Janet Wilcek, for a total of $4,000.00, the Court finds that the Trustee has not met her burden of proof to establish that these transfers to Janet were fraudulent conveyances.

It is undisputed that Joe is an insider of the Debtor pursuant to 11 U.S.C. § 101(31)(B)(ii) and (iii); that he received funds from the Debtor within one year prior to the petition date totaling $33,244.81; and the funds transferred to him were property of the Debtor. The Court finds that these transfers were made with actual fraud because many of the "badges of fraud" are present. First, there was a lack of consideration for the payments made to Joe. The checks were made payable to Joe personally or to "Cash," not in his capacity as an officer of the Debtor. Joe testified that he could not verify that the payments were made for expense reimbursement or salary. Moreover, Joseph LaPorte, the Debtor's accountant, testified that Joe never submitted any documentation to support his requests for expense reimbursement.

Next, the payments were made at a time when other creditors were not being paid and the Debtor was insolvent. Joe testified that a $700,000.00 judgment was obtained in favor of Jifram against the Debtor that could not be paid. The Debtor's bankruptcy petition, schedules and statement of financial affairs reflected that general unsecured claims totaled approximately $16,000,000.00 and assets were worth approximately $300,000.00 in June 1999. *See* Trustee's Exhibit No. 77 and HKA and Earl's Exhibit No. 22. Joe testified that the Debtor's financial situation was most likely the same in 1998, when the transfers were made. Joe's testimony that he did not think the Debtor was insolvent in 1999 is unsupported and is contradicted by the documentary evidence—the Debtor's bankruptcy petition, schedules and statement of financial affairs—which demonstrate that the Debtor's liabilities exceeded its assets at the time of the transfers. Thus, the Court finds that the Debtor was balance sheet insolvent.

Further, Joe, as the president of the Debtor, was in a position of control and did, in fact, control the Debtor's transactions by making these various checks payable to either himself or "Cash." Many of the checks were not processed through the

Debtor's accounting software, but rather, were manually typed and signed by Joe.

Finally, Joe pled the Fifth Amendment when questioned whether, as president of the Debtor, he directed the Debtor to pay funds on fictitious invoices. The United States Supreme Court in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) stated that "the Fifth Amendment does not forbid inferences against parties in civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a Civil case.'" *Id.* at 318, 96 S.Ct. 1551 (*quoting* 8 J. Wigmore, *Evidence* 439 (McNaughton rev.1961)). The rule that adverse inferences may be drawn from Fifth Amendment silence in civil proceedings has been recognized by the Seventh Circuit. *See, e.g., Harris v. City of Chicago*, 266 F.3d 750, 753 (7th Cir.2001); *Central States, S.E. & S.W. Areas Pension Fund v. Wintz Props., Inc.*, 155 F.3d 868, 872 (7th Cir.1998); *In re Maurice*, 73 F.3d 124, 126 (7th Cir.1995). The adverse interest that may be drawn when a party asserts the Fifth Amendment privilege is not a substitute for proof and cannot fill an evidentiary void. *See United States v. Rylander*, 460 U.S. 752, 758, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983). Joe's refusal to answer allows the Court to draw the inference that his testimony would be adverse to his interests, namely that the payments on the invoices evidences a pattern of fraudulent transfers from the Debtor to Joe.

In sum, the Court finds that the facts and the evidence demonstrate that sufficient indicia of badges of fraudulent intent were present, and such transfers by the Debtor to Joe constituted actual fraud under § 548(a)(1)(A). Because Joe was an insider of the Debtor and, as its president, he was in a position to control the disposition of the Debtor's property, Joe's fraudulent intent may be imputed to the Debtor. *See In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir.1983). *See also Armstrong v. Ketterling (In re Anchorage Marina, Inc.)*, 93 B.R. 686, 691 (Bankr.D.N.D.1988) ("In cases such as this one in which the Debtor is a corporation the intent of the controlling officers and directors is presumed to be the Debtor's intent.") (citation omitted).

■ In addition, the Court finds that the Trustee has demonstrated that these same transfers made by the Debtor to Joe constitute fraudulent conveyances under § 548(a)(1)(B). First, the Court finds that the Debtor did not receive equivalent value for the payments made to Joe. Joe testified at trial that he did not have the documentation to support his claim that these transfers were reimbursements for his business expenses. There was no evidence adduced at trial to show that the payments benefitted the Debtor, rather than Joe personally. Second, the Court finds that what the Debtor gave up—$33,244.81—was not reasonably equivalent to what it received—nothing. The record before the Court is wholly devoid of any evidence that these transfers to Joe were the result of reimbursement of his company expenses. Moreover, the Court has already determined that the Debtor was insolvent when the transfers were made.

■ When a transfer is avoided, the next step is to look to 11 U.S.C. § 550(a), which provides that a trustee may recover "the property transferred, or, if the court so orders, the value of such property. . . ." 11 U.S.C. § 550(a)(1); *see also FBN Food Servs.*, 82 F.3d at 1396. Once the whole transfer is pulled into the estate, the money is then distributed according to the priorities under the Bankruptcy Code. *Id.* Although the general rule is that transferees must either return the property or pay

its value, there are exceptions under § 548(c) and § 550(b). *Cohen,* 199 B.R. at 719. Where, as here, recovery is sought from the initial transferee of property, only the defense under § 548(c) is potentially available. *See Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.),* 168 B.R. 408, 419–20 (Bankr.D.Ariz.1994) (defense under § 550(b) is unavailable to "initial transferee"); *Bucki v. Singleton (In re Cardon Realty Corp.),* 146 B.R. 72, 79 n. 11 (Bankr.W.D.N.Y.1992) (same). Joe has not asserted any viable defense to the recovery of these fraudulent conveyances.

Consequently, the Court finds that the Trustee has demonstrated that the transfers to Joe in the aggregate amount of $33,244.81 constitute fraudulent conveyances pursuant to § 548(a)(1)(A) and § 548(a)(1)(B). The Court enters partial judgment in favor of the Trustee and against Joe under Count IV of the complaint. Under § 550(a)(1), the Trustee may recover those transfers in the sum of $33,244.81 from Joe for the benefit of the Debtor's estate.

■ Next, in Count IV of the complaint, the Trustee contends that the transfers by the Debtor to Joe were made with actual intent to hinder, delay or defraud the Debtor's creditors, and constitute fraudulent transfers pursuant to the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a).

The Trustee seeks to avoid the subject transfers of property from the Debtor to Joe pursuant to 11 U.S.C. § 544(b)(1) which provides in pertinent part:

> [*T]he trustee may avoid any transfer of an interest of the debtor in property* or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not

allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1) (emphasis supplied). Furthermore, if transfers are avoidable under § 544(b)(1), they can be recovered under 11 U.S.C. § 550 from, among others, "the entity for whose benefit such transfer was made." *See* 11 U.S.C. § 550(a)(1).

■ In a case under § 544(b)(1), the Trustee has the rights of an unsecured creditor to avoid transactions that can be avoided by such creditor under state law. 11 U.S.C. § 544(b)(1); *In re Image Worldwide, Ltd.,* 139 F.3d 574, 576–77 (7th Cir. 1998). The Trustee need not identify the creditor, so long as an unsecured creditor exists. *Id.* at 577; *In re Leonard,* 125 F.3d 543, 544 (7th Cir.1997). The transaction can be avoided completely even if the Trustee cannot produce creditors whose liens total more that the value of the property. *Id.* at 544–45. The Trustee has shown that Jifram is a creditor with a potentially allowable claim under § 502 that totals more than the value of the property.

The applicable state law asserted by the Trustee under § 544(b)(1) is the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* (the "UFTA"). The relevant portions of the UFTA provide:

> § 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a).

Sections 5 and 6 of the UFTA are analogous to 11 U.S.C. § 548(a)(1) and (2).[2] *See Scholes v. Lehmann,* 56 F.3d 750, 756 (7th Cir.), *cert. denied,* 516 U.S. 1028, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995). "Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA." *Levit v. Spatz (In re Spatz),* 222 B.R. 157, 164 (N.D.Ill.1998) (citation omitted); *see also Image Worldwide,* 139 F.3d at 577 (because the Illinois UFTA is a uniform act which derived phrases from § 548, the court may look to cases under § 548 and other cases interpreting other states' versions of the UFTA for assistance).

Pursuant to § 5 of the UFTA, the Trustee may recover the transfers made by the Debtor under two theories: (1) if the Debtor made the transfers with actual intent to defraud a creditor; or (2) if the Debtor did not receive reasonably equivalent value in exchange for the transfers and was insolvent at the time of the transfers or became insolvent as a result of the transfers. The UFTA speaks to two types of fraud—"fraud in fact" and "fraud in law." *Scholes,* 56 F.3d at 756–57.

"Fraud in fact" or actual fraud pursuant to § 5(a)(1) of the UFTA occurs when a debtor transfers property with the intent to hinder, delay or defraud his creditors. *Bay State Milling Co. v. Martin (In re Martin),* 145 B.R. 933, 946 (Bankr. N.D.Ill.1992), *appeal dismissed,* 151 B.R. 154 (N.D.Ill.1993). The moving party must prove a specific intent to hinder, delay or defraud. *Lindholm v. Holtz,* 221 Ill.App.3d 330, 334, 163 Ill.Dec. 706, 581 N.E.2d 860, 863 (2d Dist.1991) (citing *Gendron v. Chicago & North Western Transp. Co.,* 139 Ill.2d 422, 437, 151 Ill.Dec. 545, 564 N.E.2d 1207, 1214–15 (1990)). The Trustee has the burden of proving all elements of actual fraud under Illinois law by clear and convincing evidence. *Martin,* 145 B.R. at 946 (citation omitted); *Ray v. Winter,* 67 Ill.2d 296, 304, 10 Ill.Dec. 225, 367 N.E.2d 678, 682 (1977). While a transfer between family members is not proof *per se* of fraudulent intent, a familial relationship is weighty proof of such intent. *Berland v. Mussa (In re Mussa),* 215 B.R. 158, 168 (Bankr.N.D.Ill.1997) (citation omitted).

In determining whether a transfer is made with actual intent to defraud, the UFTA sets forth several factors—also known as the "badges of fraud"—from which an inference of fraudulent intent may be drawn. Section 5(b) of the UFTA sets forth the following indicia:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

---

**2.** An important difference between § 548 and the UFTA is that § 548 authorizes avoidance of transfers made within one year before the bankruptcy filing. 11 U.S.C. § 548(a). Causes of action for fraudulent conveyances can be brought under the UFTA, however, within four years after the transfer was made. 740 ILCS 160/10(a).

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 ILCS 160/5(b).

When these "badges of fraud" are present in sufficient number, it may give rise to an inference or presumption of fraud. *Morgan Marshall,* 278 Ill.App.3d at 251, 214 Ill.Dec. 1029, 662 N.E.2d at 602 (citation omitted). Under the Federal Rules of Evidence, "a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." Fed.R.Evid. 301. The presence of seven badges of fraud have been held sufficient to raise a presumption of fraudulent intent. *See Mussa,* 215 B.R. at 170.

Full consideration for the transfer is not, as a matter of law, an absolute defense to fraud in fact. *In re Spatz,* 222

B.R. at 169. As such, if the moving party proves fraudulent intent, then explicitly the transfer is deemed fraudulent, even if it is in exchange for valuable or full consideration. *Id.*

The UFTA expressly provides a defense to fraud in fact under § 9(a) which provides:

(a) A transfer or obligation is not voidable under paragraph (1) of subsection (a) of Section 5 against a person who took in *good faith and for a reasonably equivalent value* or against an subsequent transferee or obligee.

740 ILCS § 160/9(a) (emphasis supplied). Courts have recognized that a defense under § 9 of the UFTA consists of two elements: good faith and reasonably equivalent value. *See Spatz,* 222 B.R. at 168 (citations omitted); *Kennedy v. Four Boys Labor Serv., Inc.,* 279 Ill.App.3d 361, 370, 216 Ill.Dec. 160, 664 N.E.2d 1088, 1093 (2d Dist.1996).

Under § 5(a)(2) of the UFTA, "fraud in law," on the other hand, does not require any showing of fraudulent intent. *Scholes,* 56 F.3d at 757; *General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1079 (7th Cir.1997). Because of its nature, the conveyance is deemed constructively fraudulent. *Joy Recovery,* 257 B.R. at 268. The Trustee has the burden of proving fraud in law by a preponderance of the evidence. *See Martin,* 145 B.R. at 946 (citations omitted). A different standard of proof applies to this theory because intent to defraud is presumed when the elements of constructive fraud are established. *Id.* (citations omitted).

In order to establish that a conveyance is fraudulent in law, four elements must be present: (1) the debtor made a voluntary transfer; (2) at the time of the transfer, the debtor had incurred obli-

gations elsewhere; (3) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and (4) after the transfer, the debtor failed to retain sufficient property to pay the indebtedness. *Lease Resolution,* 128 F.3d at 1079 (citations omitted).

The distinction between "fraud in fact" and "fraud in law" cases is derived from whether or not there was any consideration for the conveyance under attack. *Second Nat'l Bank of Robinson v. Jones,* 309 Ill.App. 358, 365, 33 N.E.2d 732, 736 (4th Dist.1941). Lack of consideration or inadequate consideration for a debtor's conveyance, coupled with the existence or prospect of other unpaid creditors, triggers the "fraud in law" theory in which intent to hinder, delay or defraud is presumed from the circumstances. *See Capitol Indem. Corp. v. Keller,* 717 F.2d 324, 327 (7th Cir.1983); *Wilkey v. Wax,* 82 Ill.App.2d 67, 70, 225 N.E.2d 813, 814 (4th Dist.1967). When the natural consequences of the transfer is to harm creditors, the law constructively and conclusively presumes fraudulent intent irrespective of the debtor's actual intent. *Gendron,* 139 Ill.2d at 438, 151 Ill.Dec. 545, 564 N.E.2d at 1215.

What constitutes "reasonably equivalent value" for purposes of the UFTA has not been defined by Illinois case law.[3] The Illinois Supreme Court, in discussing a prior statute, has stated that one of the necessary elements to establish a fraudulent conveyance is that "there must be a transfer made for no or inadequate consideration." *Gendron,* 139 Ill.2d at 438, 564 N.E.2d at 1215 (citations omitted). The Illinois Appellate Court has since implied that there is no "reasonably equivalent value" when there is "no or inadequate

consideration." *Regan v. Ivanelli,* 246 Ill. App.3d 798, 805, 187 Ill.Dec. 351, 617 N.E.2d 808, 814 (2d Dist.1993); *see also Image Worldwide,* 139 F.3d at 577 (discussing Illinois interpretation of "reasonably equivalent value").

In determining whether reasonably equivalent value was received under the UFTA, courts should consider how that phrase has been construed under the Bankruptcy Code. *Image Worldwide,* 139 F.3d at 577. The Bankruptcy Code does not define the term "reasonably equivalent value." Whether "reasonably equivalent value" has been given is a question of fact. *Joy Recovery,* 257 B.R. at 268; *Crystal Med. Prods.,* 240 B.R. at 300. The factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at an arm's length; and (4) the good faith of the transferee. *Barber,* 129 F.3d at 387; *Apex Auto. Warehouse,* 238 B.R. at 773. There is no fixed formula for determining reasonable equivalence, but will depend on all the facts of each case, an important element being fair market value. *Barber,* 129 F.3d at 387.

For the same reasons articulated with respect to § 548(a)(1)(A) and § 548(a)(1)(B), the Court holds that the Trustee established the requisite elements under § 160/5(a)(1) and § 160/5(a)(2).

The Court finds that the Debtor intended to hinder or delay its creditors in their collection efforts under § 160/5(a)(1). At this point, it is helpful to analyze the evidence in terms of the eleven "badges of fraud," many of which are present: (1)

---

**3.** 740 ILCS 160/4(b) sets forth a definition for "reasonably equivalent value" that does not apply to this matter.

eight of the transfers were to an insider—the president of the Debtor; (2) Joe retained control over those funds once deposited into his account; (3) the transfers were not disclosed by the Debtor in its schedules or statement of financial affairs; (4) an approximate $700,000.00 judgment had been entered against the Debtor when the Debtor made the transfers; (5) the transfers were not of substantially all of the Debtor's assets; (6) the Debtor did not abscond; (7) many of the checks were not processed through the Debtor's accounting software, but were manually typed by Joe; (8) the Debtor did not receive a reasonably equivalent value for the transfers; (9) the Debtor was insolvent at the time of the transfers or became insolvent after the transfers; (10) the transfers occurred shortly after a substantial judgment was entered against the Debtor; and (11) there was no evidence adduced to show that the Debtor transferred the essential assets of the business to a lienor. The Court finds that a sufficient number of the "badges of fraud" exists to give rise to an inference of the Debtor's intent to hinder or delay the creditors. Hence, the Court holds that the Trustee has proven a cause of action under § 160/5(a)(1).

In addition, the Court finds that the Trustee has met all of the elements to establish a cause of action under § 160/5(a)(2). The Debtor made voluntary transfers to Joe. At the time of the transfers, the Debtor had incurred a judgment debt in the approximate sum of $700,000.00. Moreover, the Debtor made the transfers to Joe without receiving a reasonably equivalent value. Finally, after the transfers, the Debtor failed to retain sufficient property to pay its debts to other creditors. Consequently, the Court holds that the transfers were also constructively fraudulent.

■ The Trustee makes a demand for prejudgment interest. She contends it constitutes an element of compensation that corrects for the time value of money in order to make the bankruptcy estate whole and should run from the time this adversary proceeding was filed.

■ The Bankruptcy Code does not specifically provided for the award of prejudgment interest. It is within the Court's discretion whether to grant prejudgment interest. *See, e.g., FBN Food Servs.,* 175 B.R. at 690. The purpose of allowing prejudgment interest is compensatory, not punitive; such interest is granted to make the prevailing party whole. *See In re Milwaukee Cheese Wis., Inc.,* 112 F.3d 845, 849 (7th Cir.1997). Not only must the award of prejudgment interest be compensatory, it is also within the Court's discretion to determine if such award is equitable. *Id.* ("Discretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so."). "Discretion is not, however, authorization to decide who deserves the money more." *Id.* In other words, prejudgment interest is "simply an ingredient of full compensation," and should not be considered a windfall. *In re P.A. Bergner & Co.,* 140 F.3d 1111, 1123 (7th Cir.), *cert. denied,* 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998). Prejudgment interest has been awarded pursuant to the rate set forth in 28 U.S.C. § 1961 from the date the adversary proceeding was filed. *See Gray v. Travelers Ins. Co. (In re Neponset River Paper Co.),* 219 B.R. 918, 921 (Bankr.D.Mass.1998), *aff'd,* 231 B.R. 829 (1st Cir.BAP1999); *Floyd v. Dunson (In re Rodriguez),* 209 B.R. 424, 434 (Bankr.S.D.Tex.1997); *FBN Food Servs.,* 175 B.R. at 691.

The Court exercises it discretion and awards the Trustee prejudgment interest in order to compensate the bankruptcy

estate. The Trustee is entitled to prejudgment interest from the date the adversary proceeding was commenced, June 1, 2001, pursuant to the rate set forth in 28 U.S.C. § 1961. *See Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 127 B.R. 903, 913 (Bankr.S.D.Fla.1991); *Nelson Co. v. Amquip Corp. (In re Nelson Co.),* 117 B.R. 813, 818 (Bankr.E.D.Pa. 1990) (the award of interest prior to the date of demand would not be appropriate "because the transfer is not improper in any respect at the time it occurs"), *aff'd,* 128 B.R. 930 (E.D.Pa.1991).

Accordingly, the Court enters partial judgment in favor of the Trustee and against Joe pursuant to Count IV of the complaint. The Court finds that the Trustee has demonstrated that the transfers to Joe in the aggregate amount of $33,244.81 constitute fraudulent conveyances pursuant to § 548(a)(1)(A) and § 548(a)(1)(B). The Court enters partial judgment in favor of the Trustee and against Joe under Count IV of the complaint. Under § 550(a)(1), the Trustee may recover those transfers in the sum of $33,244.81 from Joe for the benefit of the Debtor's estate, plus prejudgment interest from the date of the filing of the adversary proceeding, June 1, 2001, pursuant to 28 U.S.C. § 1961. In addition, the Court holds that the transfers from the Debtor to Joe were fraudulent under 740 ILCS § 160/5(a)(1) and 740 ILCS § 160/5(a)(2). Pursuant to § 544(b)(1), the Trustee may recover those transfers in the sum of $33,244.81 from Joe for the benefit of the Debtor's estate, plus prejudgment interest from the date of the filing of the adversary proceeding, June 1, 2001 pursuant to 28 U.S.C. § 1961.

**F.** ***Count V—Avoidance and Recovery of Post–Petition Transfers Made to Joe***

 Pursuant to Count V of the complaint, the Trustee seeks to avoid and recover postpetition transfers made to Joe by the Debtor pursuant to 11 U.S.C. § 549(a) and 11 U.S.C. § 550(a). The post-petition transfers to Joe were as follows: (1) check no. 016948 on October 21, 1999 in the sum of $500.00; (2) check no. 017051 on November 24, 1999 in the amount of $750.00; and (3) check no. 017123 on December 13, 1999 in the sum of $538.44. *See* Trustee's Group Exhibit No. 79. These transfers total $1,788.44. *Id.* The Trustee alleges that these post-petition transfers were not authorized by the Court or the Bankruptcy Code. Further, the Trustee contends that the Debtor did not receive any consideration or other value for the transfers and the transfers provided no benefit to the Debtor's estate.

Section 549(a) of the Bankruptcy Code empowers the Trustee to avoid certain authorized transfers and all unauthorized post-petition transfers of property of the estate, and provides in pertinent part:

(a) the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a).

 Under this subsection, a four-part inquiry is raised: (1) whether a transfer of property occurred; (2) whether the property was property of the estate; (3) whether the transfer occurred after the commencement of the case; and (4) whether the transfer was authorized by the court or the Bankruptcy Code. *Hoagland v. Edward Hines Lumber Co. (In re LWMcK Corp.),* 196 B.R. 421, 423 (Bankr.S.D.Ill. 1996) (citation omitted). Federal Rule of

Bankruptcy Procedure 6001 provides, "[a]ny entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof." Hence, Joe has the burden of proof to show the validity of the transfers.

■ When a transfer is avoided, the next step is to look to 11 U.S.C. § 550(a), which provides in relevant part:

> (a) to the extent that a transfer is avoided under section . . . 549 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a)(1); *see also FBN Food Servs.*, 82 F.3d at 1396. Once the whole transfer is pulled into the estate, the money is then distributed according to the priorities under the Bankruptcy Code and the debtor's own commitments. *Id.*

The Court finds that the Trustee has demonstrated that there were post-petition transfers of property of the estate and that such transfers were not authorized by the Bankruptcy Code or the Court. Joe has not met his burden of proof with respect to the validity of the transfers. Joe testified that he could not remember the purpose of these post-petition transfers. Further, as previously discussed, Joe pled the Fifth Amendment and refused to answer whether he, as president of the Debtor, directed the Debtor to knowingly pay funds on fictitious invoices sent by the Debtor's vendors.

Consequently, the Court finds that the post-petition transfers to Joe by the Debtor violated § 549(a) and can be recovered from Joe pursuant to § 550(a). Thus, the Court grants judgment in favor of the Trustee and against Joe in the sum of $1,788.44, plus prejudgment interest from the date of the transfers pursuant to 28 U.S.C. § 1961.

## G. *Count XV—Avoidance and Recovery of Fraudulent Conveyances Made to Custom Cycle Supply*

■ Pursuant to Count XV of the complaint, the Trustee argues that during the year prior to the filing of the petition date and subsequent to the filing date, Joe caused the Debtor to make payments to Custom Cycle Supply ("Custom Cycle") for bicycle related equipment for the exclusive benefit of Joe. The Trustee maintains that the Debtor receive no consideration or other value for the payments made to Custom Cycle. Further, the Trustee contends that the Debtor and Custom Cycle had no business relationship. According to the Trustee, within one year prior to the petition date, the Debtor transferred, or caused to be transferred to Custom Cycle, property in which the Debtor had an interest. These pre-petition transfers to Custom Cycle were as follows: (1) check no. 014997 on October 29, 1998 in the sum of $941.00; (2) check no. 015074 on November 13, 1998 in the amount of $1,253.20; (3) check no. 015075 on November 16, 1998 in the sum of $96.26; (4) check no. 015345 on February 18, 1999 in the amount of $855.78; and (5) check no. 015529 on April 26, 1999 in the sum of $705.45. *See* Trustee's Group Exhibit No. 88. The Court notes that the Trustee has not provided check no. 015074 in the sum of $1,253.20. Nevertheless, the Court will consider this transfer absent a copy of the check. These transfers total $3,851.69.

The Trustee alleges that the Debtor did not receive a reasonably equivalent value or any value at all in exchange for these transfers. The Trustee maintains that the

Debtor was insolvent when the pre-petition transfers were made and that after payment of the transfers, the remaining assets of the Debtor were unreasonably small to operate the business of the Debtor. Additionally, the Trustee contends that after payment of these transfers, the Debtor was unable to pay its debts as they became due. Finally, the Trustee argues that Joe caused the Debtor to make these transfers with actual intent to hinder, delay or defraud any entity to which the Debtor was or became indebted on or after the date of the pre-petition transfers. The Trustee contends that these pre-petition transfers to Custom Cycle are avoidable as a fraudulent conveyance pursuant to § 548(a) and that the Trustee is entitled to recover the total of these transfers from Joe under § 550(a), plus interest, costs and attorneys' fees.

■ The Court enters judgment in favor of Joe pursuant to Count XV of the complaint. The transfers were made by the Debtor to Custom Cycle, not to Joe. Courts have held that the transferor and the transferee are deemed to be necessary parties to a fraudulent transfer suit. *See Forman v. Jeffrey Matthews Fin. Group, LLC (In re Halpert & Co., Inc.)*, 254 B.R. 104, 116 (Bankr.D.N.J.1999); *see also* Fed. R. Bankr.P. 7019. The Trustee has not joined Custom Cycle, the recipient of the transfers, as a necessary party defendant to this cause of action. Moreover, a trustee cannot succeed in an action brought under § 548 against a party who has not received any property or benefit from either the debtor or the debtor's transferee, immediate or mediate. *See Mack v. Newton*, 737 F.2d 1343, 1357 (5th Cir.1984) (Act case) ("one who did not actually receive any of the property fraudulently transferred ... will not be liable for its value, even though he may have participat-

ed or conspired in the making of a fraudulent transfer (or preference)").

Joe testified that Custom Cycle was a company that supplied bicycle parts. Further, he admitted that the Debtor did not purchase any bicycle parts for use in its business operations. Rather, Joe testified that the Debtor sponsored a bicycle team from Custom Cycle and that the Debtor received a benefit from the advertising of its business by the Custom Cycle bicycle team. The Trustee's allegation that Joe was an avid cyclist and that therefore there is a substantial likelihood that he benefitted from the transfers to Custom Cycle is not supported by any evidence. Consequently, the Court enters judgment in favor of Joe and against the Trustee under Count XV of the complaint.

**H. Count XVI—Avoidance and Recovery of Post–Petition Transfers Made to Custom Cycle Supply**

■ Under this final count of the complaint, the Trustee contends that after the filing of the Debtor's petition, the Debtor made transfers of property by check to Custom Cycle. The Custom Cycle post-petition transfers were as follows: (1) check no. 016735 on September 1, 1999 in the amount of $363.53; (2) check no. 016736 on August 30, 1999 in the amount of $363.53; (3) check no. 017033 on November 22, 1999 in the sum of $418.46; (4) check no. 017040 on November 23, 1999 in the sum of $722.85; (5) check no. 017096 on December 8, 1999 in the amount of $415.46; and (6) check no. 017244 on January 21, 2000 in the sum of $136.45. *See* Trustee's Group Exhibit No. 89. The transfers total $2,420.28. *Id.* The Trustee alleges that the post-petition transfers were not authorized by the Court or by the Bankruptcy Code. Further, the Trustee maintains that the Debtor did not receive any consideration or other value for the

294

transfers. Moreover, the Trustee argues that these transfers provided no benefit to the estate. The Trustee seeks to avoid these transfers pursuant to § 549(a) and recover them from Joe, not Custom Cycle, in the total amount of $2,420.28 under § 550(a). The Trustee also seeks the payment of interest, costs and attorney's fees.

Initially, the Court notes that the Trustee has not furnished a copy of check no. 016735 in the amount of $363.53, nor has she furnished a copy of check no. 017244 in the sum of $136.45. More importantly, the Trustee did not name Custom Cycle as a defendant in this adversary proceeding. Rather, she seeks payment from Joe for the transfers to Custom Cycle because, according to the Trustee, these payments were likely for Joe's benefit. Joe admitted that he did not seek Court authority to pay the funds to Custom Cycle. Further, the Bankruptcy Code did not authorize such transfers. Nevertheless, the Trustee has not demonstrated that Joe benefitted from these transfers by the Debtor to Custom Cycle. Joe testified that the Debtor paid Custom Cycle funds in order to support a bicycle team sponsored by Custom Cycle. Joe testified that the Debtor derived value as a result of the advertising of the Debtor's business. The Trustee argues that "as an avid cyclist, there is a substantial likelihood that Joe himself benefitted from the payments to [Custom Cycle]." (footnote omitted). However, the Trustee failed to present any evidence to demonstrate that Joe did in fact benefit from the transfers to Custom Cycle. Hence, the Court enters judgment in favor of Joe and against the Trustee under Count XVI of the complaint.

### I. *Trustee's Request for Attorneys' Fees and Costs*

The Trustee seeks costs and attorneys' fees under Counts IV, V, XV and XVI of the complaint. The Trustee failed to cite any provision in the Bankruptcy Code that warrants the award of her attorneys' fees. Sections 548 and 549 of the Bankruptcy Code, the provisions upon which the Trustee prevailed under Counts IV and V of the complaint, do not specifically authorize the Court to award attorneys' fees. In light of the absence of any statutory authority to award the Trustee attorneys' fees, the Court will adhere to the "American Rule," which provides that in cases that are based upon or involve federal law, attorneys' fees are not allowable absent a statutory basis or enforceable contract between the parties. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The general rule applies to litigation in the bankruptcy courts. *See In re Reid*, 854 F.2d 156, 161–62 (7th Cir.1988) (claim for attorneys' fees based on wrongful appointment of interim trustee in involuntary case).

The Trustee's causes of action in Counts IV and V, upon which she prevailed, are predicated on § 548(a) and § 549(a). Because the remedy created by the Bankruptcy Code for fraudulent transfers and unauthorized post-petition transactions does not give the Trustee a statutory right to attorneys' fees, and there is no contract between the parties that provides for same, the Court declines to tax Joe with the Trustee's attorneys' fees.

The Court assesses the Trustee's taxable costs incurred under Counts IV and V and allowable under 28 U.S.C. § 1920 against Joe. The Trustee shall submit a bill therefor within thirty days hereof pursuant to Local Bankruptcy Rule 7054–1.

### IV. *CONCLUSION*

For the foregoing reasons, the Court enters its proposed findings of fact and conclusions of law and recommends that

the District Court grant judgment against Joe and Earl jointly and severally and in favor of the Trustee under Count I of the complaint. The Court recommends that the District Court order an accounting from Joe and Earl to specifically identify all revenue realized by them, either directly or through HKA, from, in connection with, or as a result of the relationship with RJR that was diverted from the Debtor and utilized by Earl and Joe through HKA. Moreover, the Court recommends that the District Court impose a constructive trust on all assets presently being held by Earl and Joe, either directly or through HKA, so that it may be determined whether assets of the Debtor are being held in furtherance of, or as a consequence of, the usurpation of the RJR corporate opportunity. Further, the Court recommends that the District Court deny the Trustee's request for her attorneys' fees under 805 ILCS 5/12.60(j).

In addition, the Court recommends that the District Court grant judgment against Joe and Earl jointly and severally and in favor of the Trustee in the amount of $500,000.00 for actual damages under Count II of the complaint. The Court recommends that the District Court award the Trustee punitive damages in the sum of $500,000.00, which shall be assessed against Joe and Earl jointly and severally. The Court further recommends that the District Court assess the Trustee's taxable costs against Joe and Earl jointly and severally pursuant to 28 U.S.C. § 1920. The Trustee shall submit a bill therefor pursuant to Local Bankruptcy Rule 7054–1 within thirty days hereof.

Finally, the Court recommends that the District Court grant judgment in favor of HKA pursuant to Count III of the complaint.

This Opinion serves as proposed findings of fact and conclusions of law to the District Court pursuant to Federal Rule of Bankruptcy Procedure 7052 and 28 U.S.C. § 157(c)(1) regarding Counts I, II and III of the complaint.

Pursuant to Count IV of the complaint, the Court finds that the Trustee has demonstrated that the transfers to Joe in the aggregate amount of $33,244.81 constitute fraudulent conveyances under to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B). The Court enters partial judgment in favor of the Trustee and against Joe in the sum of $33,244.81 under Count IV of the complaint. Under 11 U.S.C. § 550(a)(1), the Trustee may recover those transfers from Joe for the benefit of the Debtor's estate, plus prejudgment interest from the date of the filing of the adversary proceeding, June 1, 2001, pursuant to 28 U.S.C. § 1961. In addition, the Court finds that the transfers from the Debtor to Joe were fraudulent under 740 ILCS § 160/5(a)(1) and 740 ILCS § 160/5(a)(2). Pursuant to 11 U.S.C. § 544(b)(1), the Trustee may recover those transfers in the sum of $33,244.81 from Joe for the benefit of the Debtor's estate, plus prejudgment interest from the date of the filing of the adversary proceeding, June 1, 2001, pursuant to 28 U.S.C. § 1961.

Moreover, the Court grants judgment in favor of the Trustee and against Joe under Count V of the complaint. Pursuant to Count V, the Court finds that the postpetition transfers by the Debtor to Joe in the sum of $1,788.44 violated 11 U.S.C. § 549(a). Pursuant to 11 U.S.C. § 550(a), the Trustee may recover those transfers from Joe for the benefit of the Debtor's estate, plus pre-judgment interest from the date of the transfers pursuant to 28 U.S.C. § 1961. The Court assesses the Trustee's taxable costs incurred under Counts IV and V of the complaint and allowable under 28 U.S.C. § 1920 against Joe. The Trustee shall submit a bill there-

for within thirty days hereof pursuant to Local Bankruptcy Rule 7054–1.

The Court enters judgment against the Trustee and in favor of Joe under Counts XV and XVI of the complaint.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052 with respect to Counts IV, V, XV and XVI of the complaint. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021 on those counts.

## PROPOSED ORDER REGARDING COUNTS I, II, AND III AND ORDER PURSUANT TO COUNTS IV, V, XV, AND XVI

For the reasons set forth in the Court's Proposed Findings of Fact and Conclusions of Law on Counts I, II and III and Memorandum Opinion on Counts IV, V, XV and XVI dated this 23rd day of June 2003, the Court recommends that the District Court grant judgment against Joe Wilcek and Earl Wilcek jointly and severally and in favor of Gina B. Krol under Count I of the complaint. The Court recommends that the District Court order an accounting from Joe Wilcek and Earl Wilcek to specifically identify all revenue realized by them, either directly or through HKA Display, Inc., from, in connection with, or as a result of the relationship with R.J. Reynolds Co. that was diverted from H. King & Associates and utilized by Earl Wilcek and Joe Wilcek through HKA Display, Inc. Moreover, the Court recommends that the District Court impose a constructive trust on all assets presently being held by Earl Wilcek and Joe Wilcek, either directly or through HKA Display, Inc., so that it may be determined whether assets of H. King & Associates are being held in furtherance of, or as a consequence of, the usurpation of the R.J. Reynolds Co.

corporate opportunity. Further, the Court recommends that the District Court deny Gina B. Krol's request for her attorneys' fees under 805 ILCS 5/12.60(j).

In addition, the Court recommends that the District Court grant judgment against Joe Wilcek and Earl Wilcek jointly and severally and in favor of Gina B. Krol in the amount of $500,000.00 for actual damages under Count II of the complaint. The Court recommends that the District Court award Gina B. Krol punitive damages in the sum of $500,000.00, which shall be assessed against Joe Wilcek and Earl Wilcek jointly and severally. The Court further recommends that the District Court assess Gina B. Krol's taxable costs against Joe Wilcek and Earl Wilcek jointly and severally pursuant to 28 U.S.C. § 1920. Gina B. Krol shall submit a bill therefor pursuant to Local Bankruptcy Rule 7054–1 within thirty days hereof.

Finally, the Court recommends that the District Court grant judgment in favor of HKA Display, Inc. pursuant to Count III of the complaint.

Pursuant to Count IV of the complaint, the Court finds that Gina B. Krol has demonstrated that the transfers to Joe Wilcek in the aggregate amount of $33,244.81 constitute fraudulent conveyances under to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B). The Court enters partial judgment in favor of Gina B. Krol and against Joe Wilcek in the sum of $33,244.81 under Count IV of the complaint. Under 11 U.S.C. § 550(a)(1), Gina B. Krol may recover those transfers from Joe Wilcek for the benefit of the estate of H. King & Associates, plus prejudgment interest from the date of the filing of the adversary proceeding, June 1, 2001, pursuant to 28 U.S.C. § 1961. In addition, the Court finds that the transfers from H. King & Associates to Joe Wilcek were fraudulent under 740 ILCS § 160/5(a)(1)

and 740 ILCS § 160/5(a)(2). Pursuant to 11 U.S.C. § 544(b)(1), Gina B. Krol may recover those transfers in the sum of $33,244.81 from Joe Wilcek for the benefit of the estate of H. King & Associates, plus prejudgment interest from the date of the filing of the adversary proceeding, June 1, 2001, pursuant to 28 U.S.C. § 1961.

Moreover, the Court grants judgment in favor of Gina B. Krol and against Joe Wilcek under Count V of the complaint. Pursuant to Count V, the Court finds that the post-petition transfers by H. King & Associates to Joe Wilcek in the sum of $1,788.44 violated 11 U.S.C. § 549(a). Pursuant to 11 U.S.C. § 550(a), Gina B. Krol may recover those transfers from Joe Wilcek for the benefit of the estate of H. King & Associates, plus pre-judgment interest from the date of the transfers pursuant to 28 U.S.C. § 1961.

The Court assesses Gina B. Krol's taxable costs incurred under Counts IV and V of the complaint and allowable under 28 U.S.C. § 1920 against Joe Wilcek. Gina B. Krol shall submit a bill therefor within thirty days hereof pursuant to Local Bankruptcy Rule 7054–1.

The Court enters judgment against Gina B. Krol and in favor of Joe Wilcek under Counts XV and XVI of the complaint.